IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AUTOTECH TECHNOLOGIES LIMITED PARTNERSHIP, an Illinois Partnership, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 05 C 5488 |
| AUTOMATIONDIRECT.COM, INC., TIMOTHY HOHMANN, AND KOYO ELECTRONICS INDUSTRIES CO., LTD. | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On September 29, 2005, plaintiff Autotech Technologies Limited Partnership, ("Autotech"), filed the pending motion seeking a preliminary injunction against Automationdirect.com ("ADC"), ADC's president Tim Holmann ("Holmann"), and ADC's parent company Koyo Electronics Industries Co., Ltd., ("Koyo") (collectively "defendants"), (Dkt. No. 5). After reviewing the parties' briefing on the motion for a preliminary injunction, this court determined that genuine issues of facts existed which required a hearing. (Dkt. No. 30). Beginning on October 28, 2005 and continuing from November 15 through November 17, 2005, this court held a hearing during which it has received evidence from the parties. (Dkt. Nos. 52, 61, 63, 64). At the conclusion of plaintiff Autotech's case-in-chief, the defendants made an oral motion for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, ("Rules"). (Dkt. No. 64). For the reasons set forth below, this court grants the defendants' oral motion for judgment as a matter of law and denies Autotech's September 29, 2005 motion for a preliminary injunction. (Dkt. No. 42).

## BACKGROUND

A. Procedural Posture

Plaintiff Autotech's initial complaint in this case was filed on September 15, 2005 in the Circuit Court of Cook County. (Dkt. No. 5 at Ex. 1). The defendants removed the matter to this court on September 23, 2005 (Dkt. No. 1), and, as stated earlier, Autotech filed the pending motion for preliminary injunction on September 29, 2005.[1] (Dkt. No. 5).

On October 10, 2005, Autotech filed a motion for a temporary restraining order ("TRO"). (Dkt. No. 15). The parties reached an agreement on the issues related to Autotech's motion for a TRO, thus mooting the motion, and this court entered an agreed order on October 11, 2005. (Dkt. Nos. 22, 23). Although the parties agreed to the order, the language of that order stated that the "order terminates in accordance with the law governing Temporary Restraining Orders or upon further order of this Court." (Dkt. No. 23 at ¶ 4). The parties also agreed during the October 19, 2005[2] status hearing to extend the agreed order to the full 20 days allowed for TROs pursuant to Rule 65, and this court set the preliminary injunction hearing for October 28, 2005. (Dkt. No. 28).

The parties were unable to complete the preliminary injunction hearing on October 28,

---

[1] The defendants' September 23, 2005 notice of removal invoked this court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. Autotech is captioned in this case as an Illinois limited partnership, and therefore on October 21, 2005, this court *sua sponte* ordered Autotech to file an amended complaint to detail the citizenship of its partners. (Dkt. No. 30). Upon a review of Autotech's first amended complaint of October 26, 2005, (Dkt. No. 42), this court is satisfied that there is complete diversity among the parties, the matter at issue involves in excess of $75,000, and that this court's diversity jurisdiction has been properly invoked.

[2] Autotech also filed a motion on October 19, 2005 for expedited discovery. (Dkt. No. 24). However, Autotech's motion for expedited discovery was withdrawn on October 20, 2005 after the parties represented to the court that they had reached an agreement on the issue. (Dkt. No. 29).

2

2005. The defendants later objected to the continuation of the agreed order beyond the 20 day period. The court was not able to schedule the reconvening of the preliminary injunction hearing until November 15, 2005 due to a previously scheduled criminal trial, other TRO requests and preliminary injunction hearings "on older matters of the same character." Fed. R. Civ. P. 65(b). Thus, the agreed order terminated on November 8, 2005. (Dkt. No. 62). On November 14, 2005, Autotech filed a motion to renew the TRO, (Dkt. No. 59), which this court denied because no authority exists to extend a TRO, beyond the 20 day period allowed under Rule 65 without the defendants' consent to the continuation. (Dkt. No. 62).

Starting again on November 15, 2005, the court received evidence for three more days through November 17, 2005. (Dkt. No. 61, 63, 64). When Autotech concluded the presentation of its case-in-chief, the defendants moved for the entry of a judgment as a matter of law that this court is now granting in this memorandum opinion and order.[3]

B. Factual Background

Autotech and ADC are two companies involved in the touch screen industry[4] and on

---

[3] A related matter *Automationdirect.com, Inc. v. Autotech Tech. L.P. et al.*, 1:05-CV-961-CC (N.D. Ga.), is currently pending before Judge Clarence Cooper of the United States District Court for the Northern District of Georgia. The parties assert that Judge Cooper is currently considering a motion to transfer that case to this court. Also pending in this case are motions by ADC to transfer this case to the Northern District of Georgia (Dkt. No. 31), and Koyo's motion to dismiss for lack of personal jurisdiction. (Dkt. No. 48).

[4] A touch screen (also referred to as an operator interface) is typically a computerized flat screen, often ranging from five to fifteen inches in diameter, that is used to operate larger manufacturing equipment. (Pl. Ex. 88, Automationdirect.com 2005 Catalog at pgs. 9-1 to 9-35). The user is able to program the touch screen so that the computer icons displayed on the screen represent switches, push buttons, gauges, charts and other items involved in the manufacturing process. (*Id.* at 9-8; 9-9). Touch screen panels are intended to be a technological and cost savings advancement beyond the manual switches, buttons and readouts that are used in the operation of large manufacturing equipment. As with all computer devices, touch screens rely on computer hardware and software to operate.

3

September 8, 1999, they entered into a contract entitled a "covenant vendor agreement," ("1999 contract"). (Pl. Ex. 1). The 1999 contract recognized that Autotech "designs, manufactures, and sells touch screens, industrial PCs, and other industrial control products, and that [ADC] is a leading direct marketing company specializing in catalog and e-commerce sales." (*Id.* at pg. 1). Under the terms of the 1999 contract, ADC would market touch screen panels and other products specifically designed for ADC by Autotech. (*Id.* at 1.1-1.3). The primary touch screen panel developed and sold by the parties was known as "EZTouch." Both parties granted exclusive rights to the other in the design, manufacturing, marketing and sales of these products during the period covered under the 1999 contract. (*Id.* at 1.5).

ADC characterizes the 1999 contract as "a simple contract" for the exclusive supply of a product (Dkt. No. 10 at pg. 6), while Autotech argues that the relationship was "something more than a legal relationship and more than just a sense of commitment." (Dkt. No. 12 at pg. 1). Autotech refers to the arrangement as a "marriage," (*Id.* at pg. 2), and therefore argues that fiduciary duties arose from this arrangement. *See also* Dkt. No. 5 at pg. 4 ("Continued references to partnership and joint venture, together with the parties' announcement of their 'marriage,' can lead to only the conclusion that a joint venture exists and that fiduciary relationships exists between the parties."). ADC argues that no additional duties existed between the parties besides those enumerated by the 1999 contract.

Under the language of the 1999 contract, the contract exist through December 31, 2004 but would be automatically renewed unless timely notice was provided by the withdrawing party. (*Id.* at 7.1-7.3). In June 2004, ADC informed Autotech, that it had decided that it did not want to continue the 1999 contract and therefore wished to end the parties exclusive relationship in the

4

design, manufacturing, marketing and sales of touch screen products at the end of 2004.

ADC now wishes to sell "C-More," a touch screen device that Autotech believes directly competes with EZTouch and other Autotech products. Autotech argues that it is entitled to an injunction limiting C-More because ADC developed C-More while the 1999 contract was still in effect. It postulates that C-More is based on its Autotech's EZTouch proprietary technology and therefore C-More is nothing more than a updated "clone" of Autotech's EZTouch product. Autotech is specifically concerned with a "point, click and remove" feature of C-More that allegedly allows a C-More user to easily replace the EZTouch device with an undated C-More device. Additionally, Autotech wants customer lists from ADC that Autotech believes were created when the parties were jointly selling the EZTouch product during the 1999 contract period.

In short, Autotech argues that ADC has gained an unfair advantage and that ADC needs to be enjoined to "level the playing field" between the parties. Autotech asserts that it will be unable to compete with the new C-More product and will go out of business without an injunction.

## STANDARDS OF ANALYSIS

Rule 52(c) allows this court to enter a judgment as a matter of law against a party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue once the party has been fully heard on that issue. Fed. R. Civ. P. 52(c). Rule 52(c) requires that a judgment as a matter of law shall be supported by findings of facts and conclusions of law as required by Rule 52(a) which may be stated in a judicial opinion such as this. *Louis Vuitton, S.A. v. K-Econo Merchandise*, 813 F.2d 133, 134

5

(7th Cir. 1987) (quoting *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422 (1943)); *see e.g., Sutter Ins. Co. v. Applied Sys., Inc.*, 393 F.3d 722, 727 (7th Cir. 2004) (noting that the judge's decision should trace a clear path from the evidence to the judgment).

"Rule 52(c) allows the district court to weigh evidence to determine whether the plaintiff has proven his case."[5] *Ortloff v. United States*, 335 F.3d 652, 660 (7th Cir. 2003) (citing *Collins v. Ralston Purina Co.*, 147 F.3d 592, 599 (7th Cir. 1998)). Upon review, the Seventh Circuit evaluates the district court's "factual determinations under the clearly erroneous standard, giving 'due regard to the opportunity of the trial court to judge the credibility of the witnesses.'" *Collins*, 147 F.3d at 599 (quoting *Zeige Distrib. Co. v. All Kitchens, Inc.*, 63 F.3d 609, 612 (7th Cir. 1995)).

"A preliminary injunction is an extraordinary remedy that is only granted where there is a clear showing of need." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). This court's decision on whether to issue a preliminary injunction is reviewed by the Seventh Circuit under an abuse of discretion standard. *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703 (7th Cir. 2005) (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). "As a threshold matter, [Autotech] must show (1) a likelihood of success on the merits, (2) irreparable harm if the preliminary injunction is denied, and (3) the inadequacy of any remedy at law." *Cooper v.*

---

[5] It should be noted that Rule 52(c)'s standard for the entry of judgment as a matter of law is different than the standard applied under Rule 50(a). Rule 50 requires a court to "consider the evidence in light most favorable to the plaintiff" when evaluating a motion for judgment as a matter of law in jury trials. *Ortloff v. United States*, 335 F.3d 652, 660 (7th Cir. 2003) (citing *Payne v. Milwaukee County*, 146 F.3d 430, 432 (7th Cir. 1998)). Rule 52(c) governs motions for judgment as a matter of law in a bench trials and hearings, and therefore is the proper standard in this case, because the court is both the finder of fact and decider of law. *Id.*

6

*Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). Once the three primary factors are considered, this court must balance the (4) the harm to parties if the preliminary injunction is wrongfully decided ("the private interests"), and (5) the impact on the persons not directly concerned in the dispute ("the public interests"). *Id.* An evidentiary hearing is required for a preliminary injunction motion when the response by the non-moving party creates genuine issues of material fact. *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) (citations omitted).

## ANALYSIS

Autotech's first amended complaint filed October 26, 2005 asserts claims for injunctive relief, breach of contract, breach of fiduciary duty, aiding and abetting the breach of fiduciary duty, fraudulent misrepresentation and declaratory judgment. (Dkt. No. 42). Autotech, however, has not demonstrated a likelihood of success on the merits of its asserted claim because fiduciary duties were not created between the parties. Moreover, there is no evidence to demonstrate that ADC breached these alleged fiduciary duties.[6]

### A. Likelihood of Success on the Merits: Alleged Fiduciary Duties

Autotech argues it is entitled to an injunction in this case because fiduciary duties were created between the parties under the 1999 contract. Autotech's position is that the 1999 contract

---

[6] The defendants also argued that Autotech would not be able to demonstrate irreparable harm because Autotech had waited over a year and a half before bringing this lawsuit. However, it appears that part of the delay in filing the present suit was due to efforts by the parties to try to settle the matter. Therefore, from the policy perspective of trying to encourage parties to attempt to settle matters, this court believes it would be inappropriate to now penalize Autotech for any alleged delay in bringing this lawsuit.

Autotech also argued that its motion should be granted because its verified complaint was uncontradicted by the defendants. However, this court found upon a review of the filings in this matter that genuine issues of material fact did exist in this matter and therefore a hearing was needed.

7

was more than just a mere supply contract, but instead was an agreement that reflected a "deeper sense of commitment to the long term success of all partners in the relationship." (Dkt. No. 5 at pg. 4).

The 1999 contract does not contain a choice of law provision but both parties have cited to Illinois law in their arguments regarding the 1999 contract. Neither party has raised any choice of law issue. Consequently, based upon the implicit position of the parties, this court will look to Illinois law to resolve the issues before it.

Under Illinois law, "[t]o establish a claim for breach of fiduciary duty, [Autotech] must prove: (1) the existence of a fiduciary duty on [ADC's] part, (2) [ADC's] breach of the duty; and (3) damages proximately resulting from the breach." *Luncini Italia Co. v. Grappolini*, No. 01 C 6405, 2003 WL 1989605, at *13 (N.D. Ill. Apr. 28, 2003) (citing *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000); *Romanek v. Connelly*, 753 N.E.2d 1062, 1072 (Ill. App. Ct. 2001)). "A fiduciary duty arises either as a matter of law or by meeting a 'special circumstance' test." *Crichton v. Golden Rule Ins. Co.*, 832 N.E.2d 843, 854 (Ill. App. Ct. 2005) (citing *Ransom v. A.B. Dick Co.*, 682 N.E.2d 314, 321 (Ill. App. Ct. 1997)).

### 1. Fiduciary Duties Established as Matter of Law through Certain Legal Relationships

Fiduciary duties exist as a matter of law in certain relationships including partnerships, a joint venture, the attorney-client relationship, guardian and ward, trustee and beneficiary and agent and principal. *Bank One, Oklahoma, N.A. v. Trammell Crow Servs, Inc.*, No. 03 C 3624, 2003 WL 23019173, at *5 (N.D. Ill. Dec. 23, 2003) (citing collection of cases). The two applicable relationships to be considered in this case are a joint venture and partnership, although for all practical purposes, the analysis for a joint venture and a partnership is the same.

"A joint venture is an association of two or more persons or entities to carry out a single, specific enterprise for profit." *Kaporovskiy v. Grecian Delight Foods, Inc.*, 787 N.E.2d 268, 273 (Ill. App. Ct. 2003) (citing *Groark v. Thorleif Larsen & Son, Inc.*, 596 N.E.2d 78, 81 (Ill. App. Ct. 1992)). "A partnership is an association of two or more persons to carry on as co-owners [of] a business for profit." 805 ILCS 205/6.

"'Partnership legal principles govern joint ventures and the only distinction of consequence between the two is that a joint venture relates to a single enterprise or transaction, whereas a partnership relates to a general business of a particular kind.'" *Landers-Scelfo v. Corp. Office Sys., Inc.*, 827 N.E.2d 1051, 1057-58 (Ill. App. Ct. 2005) (quoting *Dremco, Inc. v. S. Chapel Hill Gardens, Inc.*, 654 N.E.2d 501, 504 (Ill. App. Ct. 1995)). The burden of proving the existence of a joint venture or partnership is on the person who claims such a relationship exists. *Trustmark Ins. Co. v. Gen. Cologne Life Reinsurance of America*, No. 00 C 1926, 2001 WL 1268539, at *4 (N.D. Ill. Oct. 22, 2001) (quoting *Barton v. Evanston Hosp.*, 513 N.E.2d 65, 67 (Ill. App. Ct. 1987)) (joint venture); *In re Estate of Goldstein*, 688 N.E.2d 684, 691 (Ill. App. Ct. 1997) (citing *Seidmon v. Harris*, 526 N.E.2d 543 (Ill. App. Ct. 1988)) (partnership).

"To establish a joint-venture under governing Illinois law, a party must prove: (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint ventures; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill or knowledge; (4) a degree of joint proprietorship or mutual right to the exercise of control over the enterprise; and (5) provision for joint sharing of profit and losses." *Trustmark Ins. Co. v. Gen & Cologne Life Re of America*, 424 F.3d 542, 547 (7th Cir. 2005) (citing *Minyo v. Minyo*, 581 N.E.2d 170, 173 (Ill. App. Ct. 1991); *Ambuul v.*

*Swanson*, 516 N.E.2d 427 (Ill. App. Ct. 1987)); *see, e.g., Yokel v. Hite*, 809 N.E.2d 721, 727 (Ill. App. Ct. 2004). "To establish a partnership, [the] plaintiff must show that the parties: (1) joined together to carry on a trade or venture, (2) for their common benefit, (3) with each contributing property or services to the enterprise, and (4) having a community of interests in the profits." *Roberts v. Standard Ins. Co.*, No. 04 C 2027, 2004 WL 2367741, at *7 (N.D. Ill. Oct. 15, 2004) (citing *Maloney v. Pihera*, 573 N.E.2d 1379, 1387 (Ill. App. Ct. 1991)).

"A joint venture, like a partnership, is liable to third persons for the wrongful acts of its ventures done in the course of the joint venture agreement." *Groark v. Thorleif Larsen & Son, Inc.*, 596 N.E.2d 78, 81 (Ill. App. Ct. 1992) (citing collection of cases); *see e.g., Gen. Elec. Co. v. County of Cook*, No. 00 C 6587, 2001 WL 417321, at *42 (N.D. Ill. Mar. 5, 2001); *Fortney v. Kuipers*, No. 98 C 5387, 1999 WL 102772, at *12 (N.D. Ill. Feb. 22, 1999) ("It is well established that all partners are jointly and severally liable for conduct chargeable to the partnership for losses or injury to a third person caused by wrongful acts or omissions of a partner acting in the ordinary course of the partnership's business."); *Glass v. Kemper Corp.*, 949 F. Supp. 1341, 1346 (N.D. Ill. 1997) ("[E]very member of the joint venture is considered an agent of the joint venture for [the] purpose of carrying on its usual course of business ... and can be held liable to a third party for the acts of the other joint ventures done in the course of the enterprise.") (citations omitted).

The 1999 contract expressly excludes an essential element of both joint ventures and partnerships, the ability of one party to create liabilities with third parties on behalf of the joint enterprise to which the other members of the joint enterprise are bound. Section 1.6 of the 1999 contract states that "[n]either party is granted any right or responsibility to assume or to create

any obligations or responsibilities, express or implied, on behalf of or in the name of the other party, or to bind the other party in any manner whatsoever." (Pl. Ex. 1 at pg. 1). Therefore, Autotech and ADC under the express terms of the 1999 contract did not enter into a joint venture or a partnership because neither Autotech nor ADC had the right to create obligations or enter into agreements with third parties that would be binding on other.

This court does recognize that the use of the term "partners" in Section 1.1 in the 1999 contract could intimate the potential creation of a joint venture or a partnership. (*Id.*) Also in Part Six, the 1999 contract discusses a joint investment account from which profits could be used for new promotions, new product development, documentation, dividends and onsite support. (*Id.* at pg. 6). However, the existence of some of the elements for a joint venture or a partnership does not result in the relationship being created under Illinois law when the contracting parties explicitly excluded one of the necessary elements required for the creation of a joint venture or partnership. *See O'Brien v. Cacciatore*, 591 N.E.2d 1384, 1390 (Ill. App. Ct. 1992) (holding that a partnership or joint venture requires that "all partners or joint ventures are liable jointly for all debts and obligations of the partnership or venture."). In the 1999 contract, the necessary element of joint liability for all debts and obligations is expressly disclaimed and therefore the legal relationship of a joint venture or partnership could not exist between Autotech and ADC.

### 2. Fiduciary Relationships Established through Special Circumstances

Although Autotech and ADC did not enter into a legal relationship that would explicitly create fiduciary duties between the parties as a matter of law, if the "special circumstances" exist in the business interactions of Autotech and ADC, fiduciary duties could still be created. This court has received evidence from the parties as to the relationship between Autotech and ADC,

as well as the relationship between their respective CEOs, Shalabh Kumar ("Kumar"), and Hohmann. Here special circumstances do not exist that would create the existence of fiduciary duties between Autotech and ADC because these are two sophisticated businesses run by two experienced businessmen neither of which gained superiority of influence over the other.

"A fiduciary relationship might also arise as a result of the special circumstances of the parties' relationship where one party places trust in another so that the later gains superiority and influence over the former." *Crichton v. Golden Rule Ins. Co.*, 832 N.E.2d 843, 854 (Ill. App. Ct. 2005) (citing *Ransom v. A.B. Dick Co.*, 682 N.E.2d 314, 321 (Ill. App. Ct. 1997)). "When the relationship between the parties is not one that gives rise to a fiduciary relationship as a matter of law, the party asserting the existence of the relationship has the burden of establishing such by clear and convincing evidence." *Prime Leasing, Inc. v. Kending*, 773 N.E.2d 84, 96 (Ill. App Ct. 2002) (*Ransom v. A.B. Dick Co.*, 682 N.E.2d 314, 321-22 (Ill. App. Ct. 1997)).

"It is well established under Illinois law that parties to a contract do not owe a fiduciary duty to one another" by the mere fact that they parties have entered into a contract. *Prescott v. Allstate Life Ins. Co.*, 341 F. Supp. 2d 1023, 1028 (N.D. Ill. 2004) (citing *Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992); *Oil Express Nat'l, Inc. v. Burgstone*, 958 F. Supp. 366, 370 (N.D. Ill. 1997)); *see, e.g., Ogdon v. Hoyt*, No. 04 C 2412, 2005 WL 66039, at *8 (N.D. Ill. Jan. 11, 2005) (noting that "a contractual relationship alone does not normally create a fiduciary duty."). The superiority and influence gained by one party over the other must be substantial in order to establish a fiduciary relationship. *Fid. Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.* 161 F. Supp. 2d 876, 885 (N.D. Ill. 2001).

"When determining whether contracting businesses have a fiduciary relationship, courts consider [the parties'] level of experience and the degree to which one business is subservient to the other." *Am. Hardware Mfrs. Ass'n v. Reed Elsevier, Inc.*, No. 03 C 9421, 2004 WL 3363844, at *12 (N.D. Ill. Dec. 28, 2004) (citing *Humana Health Plan, Inc. v. Heritage Indiana Medical Group*, No. 99 C 6276, 2001 WL 8878, at *3 (N.D. Ill. Jan. 3, 2001)). The court should also consider "the degree of kinship between the parties; the disparity in age, health, mental condition[,] ... education and business experience between the parties; and the extent to which the [sub]'servient' party entrusted the handing of its business affairs to the 'dominant party' and placed trust and confidence in it." *Prime Leasing, Inc. v. Kending*, 773 N.E.2d 84, 96 (Ill. App Ct. 2002) (*Ransom v. A.B. Dick Co.*, 682 N.E.2d 314, 321-22 (Ill. App. Ct. 1997)).

Autotech introduced evidence of how Autotech and ADC had been "married" together under the 1999 contract. (Pl. Ex. 1A). Under this "marriage," Autotech alleges that it treated ADC, Hohmann and other ADC employees differently than other companies with which Autotech engaged in business. Autotech also introduced testimony to argue that Autotech had "turned over" the keys to Autotech to ADC.

However, as stated earlier the evidence established that Autotech and ADC are two sophisticated businesses run by experienced people. These companies have many customers, employ several hundred individuals, create and market complex computer and other technical devices and engage in millions of dollars in sales and other transactions.

Additionally, Kuhmar and Hohmann, the heads of Autotech and ADC respectively, are sophisticated businessmen. It is noteworthy that Kuhmar testified that he has been engaged in business for approximately thirty years. He also testified that before entering into business he

13

received a masters degree in electrical engineering. Additionally, he testified that he served on a business advisory panel to President Ronald Reagan with approximately 60-70 other business people in the 1980s. Kuhmar is an intelligent, educated and experienced businessman.

Kuhmar and Hohmann both testified about their respective moral and religious beliefs and the fact that their shared views were the foundation of their friendship. Their friendship appears to have developed in addition to their common business goals of trying to grow their companies and compete with other companies in their industry. Entering into a personal friendship does not, however, create fiduciary duties under the law. Autotech has failed to establish that special circumstances existed that created fiduciary duties between the parties.

B. Likelihood of Success on the Merits: Breach of the Alleged Fiduciary Duties?

Even if fiduciaries duties had been created between the parties, those duties, by themselves, do not demonstrate a likelihood of success on the merits. Autotech must also demonstrate that ADC breached these alleged fiduciary duties and that damages resulted from that breach. *Luncini Italia Co. v. Grappolini*, No. 01 C 6405, 2003 WL 1989605, at *13 (N.D. Ill. Apr. 28, 2003) (citing *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000); *Romanek v. Connelly*, 753 N.E.2d 1062, 1072 (Ill. App. Ct. 2001)).

Autotech has not demonstrated that any breach or resulting harm has occurred in this case that would entitle it to a preliminary injunction. Autotech's arguments focus on ADC's new C-More product that Autotech alleges is a clone of Autotech's "EZTouch" touch screen product. Autotech's evidence and arguments on this issue, however, are not sufficient to establish a likelihood of success on the merits.

Autotech argues that ADC has breached the alleged fiduciary duties between the parties

through the development of the C-More product. Autotech believes that C-More is "clone" of EZTouch that ADC developed based on proprietary information that ADC obtained from Autotech. Autotech points to the similarity of the display of the computer icons on C-More as compared to EZTouch. Autotech also argues that C-More's "point, click and replace" feature demonstrates that C-More is based on EZTouch technology because, according to Autotech, it is impossible to develop this feature independently.

Autotech offered the testimony of Peter M. Martin ("Martin"), as an expert witness in support of Autotech's position that C-More is a clone of EZTouch. The defendants objected to Martin as an expert and this court sustains the defendants' objection because it finds Martin's methodology for arriving at his opinion to be unreliable.

"The Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, stated that a district court has a 'gatekeeping role' of ensuring that an expert's testimony is both relevant and reliable." *Haager v. Chicago Rail Link, LLC,* – F.R.D. –, No. 04 C 6210, 2005 WL 2656383, at *2 (N.D. Ill. Oct. 17, 2005) (citing 509 U.S. 579, 597 (1993)). As the proponent of Martin's testimony, Autotech has the burden of establishing the admissibility of the testimony by a preponderance of the evidence. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, No. 01 C 4366, 2003 WL 21506808, at *1 (N.D. Ill. June 27, 2003) (citing *Abdishi v. Phillip Morris*, No. 98 C 1310, 1999 WL 756054, at *2 (N.D. Ill. Sept. 7, 1999)).

Rule 702 of the Federal Rules of Evidence regulates testimony by expert witnesses. Experts may offer testimony in the form of an opinion that it is helpful to the trier of fact on an issue of fact if, among other things, "the testimony is the product of reliable principles and methods." Fed. R. Evid. 702. "It is not the trial court's role to decide whether an expert's

opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000).

"The *Daubert* court announced five factors that may be used in accessing relevance and reliability of expert testimony: (1) whether the particular scientific theory 'can be (and has been) tested;' (2) whether the theory 'has been subjected to peer review and publication;' (3) the 'known or potential rate of error;' (4) the 'existence and maintenance of standards controlling the technique's operation;' and (5) whether the technique has achieved 'general acceptance' in the relevant scientific or expert community." *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003) (citing *Daubert*, 509 U.S. at 593-94). "This list is neither definitive nor exhaustive, but rather flexible to account for the various types of potentially appropriate expert testimony." *Id.*

Martin's principles and methods are unreliable. He testified that he did not review the C-More product or its software code. Instead, he stated that the extent of his knowledge about C-More was based on information he received from Autotech and a printout of a webpage from ADC's website advertising the C-More product. Thus, it appears from the evidence that the extent of Martin's knowledge about C-More comes from an advertisement created by ADC for the general public. *Compare Computer Assoc. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 694 (citing *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 834-42 (10th Cir. 1993); *Computer Assoc. Int'l v. Altai, Inc.*, 982 F.2d 693, 706-12 (2d Cir. 1992) (holding that an expert's methodology was reliable in a software copyright infringement case when the expert compared the two computer programs at the source code level)). Martin's methodology of

looking at a general advertisement about C-More does not provide him with sufficient information that, under Rule 702 and *Daubert*, is of use to this court as the trier of fact and therefore this court sustains the defendants' objection to his proffered expert testimony.

Autotech's other arguments on whether C-More is a "clone" are also unpersuasive. Autotech provided evidence to try to support an argument that a transfer of design information had occurred between the two companies while the 1999 contract was in effect. However, Autotech failed to provide any evidence demonstrating that any information allegedly transferred during the period was used in C-More. Additionally, there is an inconsistency in the 1999 contract in that it states that Autotech will design the products "specifically for [ADC]." (Pl. Ex. 1 at pg. 1). Thus, both parties appeared to be arguing that they have ownership in the devices that were developed by the alleged joint efforts under the 1999 contract. The 1999 contract does not address that point, and this court need not and does not decide that issue, since Autotech's failure to provide sufficient evidence on the C-More product beyond the mere advertisement is fatal to Autotech's position that C-More is a clone. Lastly, the defendants have provided creditable evidence that the similarity in appearance of the computer icons displayed on an EZTouch and C-More is due to the fact that both parties used a common vendor to supply the computer software responsible for creating the displayed icons.

## CONCLUSION

For the reasons set forth above, the defendants' oral motion for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, (Dkt. No. 64) is granted. Autotech' motion for a preliminary injunction of September 29, 2005, (Dkt. No. 5) is denied. Autotech's responses to ADC's motion to transfer venue of October 24, 2005 (Dkt. No. 31), and

Koyo's motion to quash service and dismiss the amended complaint of October 26, 2005 are due November 30, 2005. The defendants' replies are due December 7, 2005.

ENTER:

JAMES F. HOLDERMAN
United States District Judge

Date: November 23, 2005