IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AUTOTECH TECHNOLOGIES LIMITED PARTNERSHIP, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| AUTOMATIONDIRECT.COM, INC., TIMOTHY HOHMANN and KOYO ELECTRONICS INDUSTRIES CO., LTD. | ) ) ) ) | No. 05 C 5488 |
| Defendants. | ) ) | Chief Judge James F. Holderman |
| | ) ) | Magistrate Judge Jeffrey Cole |
| AUTOMATIONDIRECT.COM, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| AUTOTECH TECHNOLOGIES L.P., AVG ADVANCED TECHNOLOGIES, INC., SHALLI INDUSTRIES, INC., and SHALABH KUMAR, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

### BACKGROUND

On January 18, 2006, Automationdirect.com ("ADC") moved for a protective order pursuant to Rule 26(c) regarding discovery of the names of customers and contacted prospective customers (and related information) who have been sold or solicited to purchase products ADC has received

from Autotech Technologies L.P. ("Autotech").[1] The parties briefed the matter, taking diametrically opposed positions: ADC insisted that its customer names and related information were not discoverable under any circumstances, and that no safeguards could ensure the confidentiality of the information. Autotech insisted that it should have unrestricted access to the customer information. As in most cases where there is a clash of absolutes, the answer was to be found in a compromise. I urged the parties to negotiate a mutually acceptable "attorneys-eyes-only" type of arrangement – a mechanism that in cases such as this has received repeated judicial approval. *See Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.*, 235 F.R.D. 435 (N.D.Ill. 2006)

Unable to agree on who should have access to the information covered by the order, they each submitted a version that reflected their respective positions along with supporting briefs. Following the completion of the briefing, the parties came to a partial agreement at the oral argument on June 29, 2006. First, it was agreed that the customer information that would be covered by any protective order would include not just names, addresses, and phone numbers, but customer communications with ADC as well. Second, the parties agreed that Mr. Fleischer, Autotech's outside counsel, and members of his firm, Chuhak & Tecson, could have access to the customers' names, addresses, and phone numbers and related information in an unredacted form. However, ADC balked at allowing such access to Mr. Kumar – Autotech's CEO and a defendant in this case. Finally it was agreed that Mr. Kumar would have access only to customer communications, with

---

[1] In a relatively brief span of time, the case has generated four opinions, which discuss the background of the case, which need not be revisited here. *See Autotech Technologies Ltd. Partnership v. Autmationdirect.com, Inc.*, 05-5488, 2005 WL 3180147 (N.D.Ill. Nov. 23, 2005); *Autotech Technologies Ltd. Partnership v. Automationdirect.Com, Inc.*, No. 05-5488, 2006 WL 1304949 (N.D.Ill. May 10, 2006); *Autotech Technologies Ltd. Partnership v. Automationdirect.Com, Inc.*, 236 F.R.D. 396 (N.D.Ill. 2006); *Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.*, 235 F.R.D. 435 (N.D.Ill. 2006).

names and identifying information redacted.

The parties could not, however, agree on whether Messrs. Corn and Susler – Autotech's two in-house attorneys – would have access to both customer information and communications without redaction or whether their access should be restricted along with Mr. Kumar's. Autotech continues to insist upon unfettered access for Messrs. Corn and Sussler, while ADC maintains that, as with Mr. Kumar, only access to redacted customer information is appropriate.

## ANALYSIS

### A.

In the instant case, ADC's legitimate interest in ensuring that certain confidential information be protected must be weighed in the balance with Autotech's competing interest in its counsel having access to that information so that it may prosecute its claims. Those competing interests are accommodated by an "attorneys'- eyes- only" protective order. Such orders have become *de rigeur*, at least where outside counsel are to have access to the information. *Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.*, 235 F.R.D. 435 (N.D.Ill. 2006). The problem becomes more complicated when a party insists that its in-house counsel have the same access under the protective order. After all, the argument goes, in-house counsel are members of the bar, are bound by the same canons of ethics as other lawyers, and are subject to the same sanctions as outside counsel for violations of the order. Consequently, to introduce some asymmetry into the right of access at once unfairly stigmatizes in-house counsel and impermissibly prejudices the party that employs them.

But to concede that the rectitude of in-house counsel is equal to that of outside counsel and that the same deterrent sanctions apply equally to both groups does not require a finding of perfect

3

equivalence between in-house and outside counsel. "Regardless of an occasional statement of some courts to the contrary, house counsel are subject to pressures different from those which outside counsel face, if only that their own economic well-being is inextricably bound up with their employer's." In re PPG Industries, Inc., 944 F.2d 912, 1991 WL 191142, at **1 (Fed.Cir. 1991)(unpublished opinion).[2] Nonetheless, preferring a rule of fairness to one of administrative convenience and simplicity, the federal courts have refused to allow controlling weight to be given to the classification of counsel as in-house rather than retained. They have required a case-by-case analysis where it is claimed that in-house counsel ought not be allowed to have access to information that is otherwise available to outside counsel. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir.), *cert. denied, BB Asset Management, Inc. v. Symantec Corp.*, 506 U.S. 869 (1992).

The sole question is whether there is an unacceptable risk of or opportunity for "inadvertent disclosure" of confidential information. *Matsushita Elec. Indus. Co., Ltd. v. United States*, 929 F.2d 1577, 1579 (Fed. Cir. 1991). In *United States Steel Corp. v. United States*, 730 F.2d 1465 (Fed.Cir.1984), the Federal Circuit explained it this way:

> Like retained counsel, however, in-house counsel are officers of the court, are bound by the same Code of Professional Responsibility, and are subject to the same sanctions. In-house counsel provide the same services and are subject to the same types of pressures as retained counsel. The problem and importance of avoiding inadvertent disclosure is the same for both. Inadvertence, like the thief-in-the-night, is no respecter of its victims. Inadvertent or accidental disclosure may or may not be predictable. To the extent that it may be predicted, and cannot be adequately forestalled in the design of a protective order, it may be a factor in the access decision. Whether an unacceptable opportunity for inadvertent disclosure exists, however, must be determined, as above indicated, by the facts on a counsel-by-

---

[2] Years earlier, the Federal Circuit said in-house counsel "are subject to the same types of pressure as retained counsel." *United States Steel Corp. v. United States*, 730 F.2d 1465, 1468 n.3 (1984).

counsel basis, and cannot be determined solely by giving controlling weight to the classification of counsel as in-house rather than retained.

*Id.* at 1468. *See also Brown Bag Software*, 960 F.2d at 1470; *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980).

*United States Steel* employed the phrase "competitive decision-making," not as a self-defining test, but "as a serviceable *shorthand* for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." 730 F.2d at 1468 n.3. (Parenthesis in original)(Emphasis supplied). *See also FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980). *United States Steel* made it clear that analysis of the risk of inadvertent disclosure involves an assessment of the entire setting in which in-house counsel functions, and that involvement in competitive decision-making, while an important consideration, it was not necessarily the exclusive one. Indeed, the parties in that case called it *one* basis for limiting access, and the court said it was an example of an instance where a party ought to be forced to rely on outside counsel. 730 F.2d at 1468 and n.3.

Nonetheless, as *Volvo Penta of the Americas, Inc. v. Brunswick Corp.*, 187 F.R.D. 240, 245 (E.D.Va.1999) noted, some courts have transformed it into a litmus test that looks solely to whether in-house counsel has direct involvement in his or her employer's "competitive decisionmaking." But, as Justice Holmes warned, courts must be wary of the uncritical and indiscriminate use of catch phrases – like the one used in *United States Steel*: "It is not the first use but the tiresome repetition of inadequate catch words upon which I am observing – phrases which originally were contributions, but which, by their very felicity delay further analysis. . . ." Holmes, *Law and Science and Science*

*and Law*, 12 Harv.L.Rev. 443, 455 (1899). *See also Lorenzo v. Wirth*, 170 Mass. 596, 600, 49 N.E. 1010 (1898)(Holmes, J.)("Too broadly generalized conceptions are a constant source of fallacy"); *Meridian Security Insurance Co. v. Sadowski*, 441 F.3d 536 (7th Cir. 2006)("The phrase [reasonable probability] acquired a life of its own"; "the turn of the phrase was infelicitous.").

In the end, proper analysis requires a careful and comprehensive inquiry into in-house counsel's actual (not nominal) role in the affairs of the company, his association and relationship with those in the corporate hierarchy who are competitive decision makers, and any other factor that enhances the risk of inadvertent disclosure. That risk must then be balanced against the harm that will result to the party employing in-house counsel from restrictions on the latter's access to the protected information. *United States Steel*, 730 F.2d at 1468; *Brown Bag Software*, 960 F.2d at 1470.

Where in-house counsel are involved in competitive decision making, in the broad and discerning sense envisioned by *United States Steel*, the risk of inadvertent disclosure is obviously higher than for retained counsel. In that context, compartmentalization of protected information from that which may be properly utilized in competitive decision-making is, to borrow Justice Cardozo's phrase used in another context, "a feat beyond the compass of ordinary minds." *Shepard v. United States*, 290 U.S. 96 (1933). *See Intel Corp. v. VIA Technologies, Inc.*, 198 F.R.D. 525, 531 (N.D.Cal.2000)("good intentions are insufficient to prevent inadvertent disclosure of confidential information because it is not possible for counsel to 'lock-up trade secrets in [her] mind'").[3]

---

[3] As Judge Shadur remarked in a related context, once knowledge has been gained, a person cannot "perform a prefrontal lobotomy on [himself]." *Fleming Sales Co., Inc. v. Bailey*, 611 F.Supp. 507, 514 (N.D.Ill.1985).

## B.
## In The Setting Of The Instant Case, The Applicable Factors Weigh In Favor Of An Order Limiting In-House Counsels' Access To Customer Information

### 1.

We begin by crediting fully the sincere assurance that Autotech's in-house counsel will endeavor to abide by any attorneys-eyes-only protective order that is entered. But acceptance of that assurance marks the beginning and not the end of analysis. *Brown Bag Software*, 960 F.2d at 1471. As the D.C. Circuit said years ago, "the court does not in any way doubt the faithfulness of house counsel in endeavoring to abide by the terms of any protective order. The issue concerns not good faith but risk of inadvertent disclosure." *FTC v. Exxon Corp.*, 636 F.2d at 1350.[4] Just as "[i]nadvertence . . . is no respecter of its victims," *United States Steel*, neither is it a respecter of the integrity of those who fall prey to it.

### 2.

The Autotech Parties describe themselves as comprising various entities of a small company – their total annual sales are approximately $14,000,000 whereas the defendants comprise a vastly larger company, whose corporate parent has gross sales in excess of a billion dollars. (*Kumar Decl.*, ¶¶19-20). Mr. Fleischer has been representing Autotech since 1983 and has been counsel in this case both here and in Georgia before the case was transferred. Mr. Susler and Mr. Corn are in-house counsel. Mr. Susler serves as Autotech's general counsel. Mr. Susler has estimated that 95% of his

---

[4] *See also Andrx Pharmaceuticals, LLC v. GlaxoSmithKline, PLC*, No. 05-23264, 2006 WL 2023540, *3 (S.D.Fla. July 7, 2006)("Even if the competitor's counsel acted in the best of faith and in accordance with the highest ethical standards, the question remains whether access to the moving party's confidential information would create 'an unacceptable opportunity for inadvertent disclosure.'"); *Nazomi Communications, Inc. v. Arm Holdings PLC*, No. 02-2521, 2002 WL 32831822, *3 (N.D.Cal. Oct. 11, 2002)(leading cases in this area presuppose fidelity to ethical duties and bar access only when there is a significant risk of *inadvertent* disclosure).

work is litigation related, with the remaining 5% consisting of transactional work. His name appears, along with Mr. Fleischer's, on numerous filings in the case. He has denied any involvement in Autotech's competitive decision making such as decisions concerning pricing, product design, marketing, advertising and sales of the Autotech products. (*Susler Declaration*, at ¶¶4-5). He has been with Autotech for four years. Mr. Susler reports to Mr. Fleischer and to Mr. Kumar regarding the litigation. Mr. Susler, who has described himself as Mr. Fleischer's associate in this case, is instructed by and reports to Mr. Fleischer in connection with that involvement, "[w]ith Mr. Kumar's consultation and approval. . . ." (*Susler Decl.*, at ¶¶1-7)at 8. He says he has not been involved with customer sales or marketing, or any "competitive decision-making such as pricing or product design." (*Susler Decl.*, ¶ 5).

Mr. Corn was hired to help defray the costs of the litigation in early 2006. *(Declaration of Martin J. Corn ("Corn Decl.")*, ¶¶ 5, 9). And, as with Mr. Susler, Mr. Corn is instructed by Mr. Fleischer as to how pending matters in the litigation are to be handled, "[w]ith Mr. Kumar's consultation and approval. . . ." (*Corn Decl.*, at ¶¶15-16; *Fleischer Decl.*, ¶¶ 1, 7). Since he was hired, he has worked almost exclusively on this case. (*Corn Decl.* ¶ 10). Mr. Corn was told he would be lead counsel in the litigation, as opposed to merely monitoring it. (*Corn Decl.*, ¶ 6). But like Mr. Susler, Mr. Corn reports to both Mr. Fleischer and Mr. Kumar. (*Corn Decl.*, ¶ 15). And, like Mr. Susler, he takes his direction from Mr. Fleischer, subject to Mr. Kumar's consultation and approval.

Mr. Fleischer has said that Mr. Susler and Mr. Corn "handle aspects of the litigation in question." (*Fleischer Decl.*, ¶ 10). From this, it must be concluded that their role in the litigation is not all-encompassing, and that Mr. Fleischer (in conjunction with Mr. Kumar) determines what

aspects they are and are not to be involved in.

Autotech contends that Mr. Corn and Mr. Susler are not involved in "competitive decision-making." ADC says that their roles are sufficiently close to competitive decision-makers that they ought be disqualified from having access to confidential customer information. And if that is not enough, ADC argues that there is a potential for such involvement in the future – a potential not denied by Autotech.

Mr. Kumar's dominant and pervasive role in both Autotech and this litigation cannot be overstated. Nor can the risks to him and Autotech in the event the litigation does not go their way be too strongly emphasized. Mr. Kumar is named personally as a defendant, and Autotech has suggested that its fate hangs on the outcome of the litigation. (*Autotech's Memorandum in Support of Their Proposed Protective Order*, at 3-4, 13). Mr. Kumar's economic interests are intimately bound up with those of Autotech. He is Autotech's chief executive officer, and the person most actively involved in the decisions relating to the design, development, manufacturing, and marketing of the EZ Touch and EZ Text Panels that are the subject of this litigation. (*Declaration of Shalabh Kumar* ("*Kumar Decl.*") ¶ 1; *ADC's Brief in Support of Proposed Protective Order*, Ex. B, *Deposition of Shalabh Kumar* ("*Kumar Dep.*") at 8, 12-13). He negotiated the agreements between Autotech and ADC, and he was responsible for hiring all the attorneys Autotech has employed in this matter. (*Kumar Decl.* ¶¶ 5-7).

Moreover, Mr. Kumar has been uniquely and pervasively involved in the day-to-day conduct of literally all facets of the litigation. (*Kumar Decl.*, ¶¶ 8, 12, 14). Her has attended every deposition and every substantive court hearing and conference. (*Kumar Decl.*, ¶¶ 8-10). He has been involved in every document production. (*Kumar Decl.*, ¶ 11). Throughout the depositions of ADC's

9

value-added resellers during March 2006, Mr. Kumar supplied written notes to Mr. Corn and conversed with him during the examination of witnesses, which sometimes led to Mr. Corn's immediately examining the witness in new areas. (*Declaration of Alan Lipton ("Lipton Decl.")* ¶ 4). Similarly, Mr. Kumar regularly communicated with Mr. Corn while Mr. Corn was defending two depositions of Autotech employees; these communications often resulted in Mr. Corn's assertion of an objection. (*Lipton Decl.*, ¶ 5). When ADC produced documents for Autotech's inspection in early April 2006 in Atlanta, Mr. Kumar traveled from Illinois to attend the document production with Mr. Corn. Indeed, the timing of Autotech's document review was scheduled so that Mr. Kumar would be able to attend the production prior to his traveling out of the country.

What emerges with unmistakable clarity from the evidentiary record is that while Mr. Fleischer, consistent with his role as counsel for Autotech for almost a quarter century, has overall responsibility for the litigation and that Messrs. Corn and Susler are subordinate to him in this case, they are all subject to Mr. Kumar's "consultation and approval."

And what also emerges with equal clarity is that Mr. Kumar is Autotech's heart and soul. The size and one dimensional managerial hierarchy of Autotech are significant, but not for the *ad misericordiam* reasons suggested by Autotech. (*Autotech Memorandum*, at 13; *Autotech Reply Memorandum*, at 12). Rather, they are factors critical to determining the risk of inadvertent disclosure of confidential information by in-house counsel. *See Intel Corp.*, 198 F.R.D. at 530 (discussing consideration of company's size in analysis); *Thomas & Betts Corp. v. Panduit Corp.*, No. 93-4017, 1997 WL 603880, *12 (N.D.Ill. Sept. 23, 1997)(Moran, J.)(small, family business); *A. Hirsh, Inc. v. United States*, 657 F.Supp. 1297 (CIT 1987) (attorney was an officer of a small family business).

It is one thing to be in-house counsel in a company with several lawyers and layers of management with whom interaction and involvement may be episodic and may well be topically limited. It is quite another where a company's two attorneys take their ultimate instructions in the litigation from a single individual, who is, for all intents and purposes, the corporation, and who is intimately involved in every facet of the litigation. The frequency and intensity of the interactions between Mr. Kumar and Messrs. Corn and Susler – and the absolutely critical nature of the litigation to the future of Autotech – make the risk of inadvertent disclosure far greater than in those cases in which in-house counsel have been allowed access to confidential materials.

Under the proposal advanced by Autotech, Mr. Kumar would be provided with redacted documents while Messrs. Corn and Susler would have the unredacted versions. In light of Mr. Kumar's pervasive participation in the case, it cannot be doubted that there will be discussions about the redacted documents. But Messrs. Corn and Susler will have in mind – if they are allowed access to the unredacted versions – those portions that have been redacted as well as those that have not. Compartmentalization would be exceedingly difficult, if not impossible, and thus the risk of inadvertent disclosure would be heightened to an unacceptable degree. Once Mr. Kumar learns of the confidential information, it would be manifestly impossible for him to perform the mental gymnastic of putting the information out of his consciousness and making competitive decisions independent of that information. Mr. Kumar would be no more able to do that than the boy in Mark Twain's story who was told to stand in a corner and not think of a white elephant. *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 656 (2d Cir. 1946) (Frank, J., dissenting). To tell someone not to "think about the beast is to assure at least a fleeting mental image." *United States v. DeCastris*, 798 F.2d 261, 264 (7th Cir. 1986).

In short, it is Mr. Kumar's unique role in Autotech, his enveloping participation in the litigation, the absence of safeguards resulting from a layered managerial hierarchy, and the criticality of the outcome of the litigation to the possible economic destiny of Autotech and Mr. Kumar personally that make it appropriate to restrict in-house counsels' access to ADC's confidential customer information. *See Intel Corp.*, 198 F.R.D. at 530 (limiting access where in-house counsel reported directly to vice president involved in competitive decision-making and whose access to confidential information had been restricted).

### 3.
### The Nature of Autotech's Claims Further Supports Restricting In-House Counsels' Access To Confidential Customer Information

Beyond the relationship between counsel and client and the nature of their activities under the particular facts of the case, there must be a consideration of the nature of the claims. *United States Steel*, 730 F.2d at 1468; *Brown Bag Software*, 960 F.2d at 1470. A significant focus of Autotech's claims involves the customer lists and related information to which Autotech contends it is entitled under the terms of the parties' "covenant vendor agreement." (*Autotech's Response to ADC's Motion*, at 1-2, 4). That claim is part of Autotech's breach of contract suit. On September 29, 2005, Autotech moved for a preliminary injunction and sought, among its requests for relief, the names of "all customers and contacted persons who have been solicited or sold any of the products purchased by ADC from Autotech." (*Motion for Preliminary Injunctive Relief*, at 8).

Judge Holderman denied that motion, and the relief sought, on November 23, 2005. Autotech again sought the names of ADC's customers when it served interrogatories and production requests upon ADC on December 16, 2005. (*ADC's Motion for Protective Order*, at 2). As part of these requests, Autotech demanded ADC's customer lists from 2000 to the present for information

relating to purchasers or potential purchasers of any and all products in the EZTouch and EZText product lines and all customer lists and documents regarding or pertaining to any and all warranty returns of any and all products in those product lines. ADC objected to the request, and the instant dispute regarding the appropriate scope of a protective order ensued.

Mr. Corn and Mr. Susler have sworn that they have no role in competitive decision making for Autotech. While they play no role in pricing or marketing decisions, the nature of this case and Autotech's emphasis on its severe financial predicament and Mr. Kumar's all-purpose role in the company, make litigation decision-making and competitive decision-making blend imperceptibly together. Autotech has said that its financial resources have been severely and adversely affected by the litigation, and that its total gross sales are down significantly. An adverse result in this case could, Autotech hints, sound the death knell for the company. (*Autotech's Memorandum in Support of Their Proposed Protective Order*, at 3-4, 13). And it is plain that for Autotech, this litigation, to a very significant degree, is about the customer information at issue.

Autotech may prove to be entitled to the customer information it seeks in its breach of contract claim but, thus far, these proceedings are only in the discovery stages. Discovery is not intended to be used to acquire indirectly the very relief that is supposed to await the determination of the action on the merits. *Liveware Publishing, Inc. v. Best Software, Inc.*, 252 F.Supp.2d 74, 85 (D.Del. 2003). In *Liveware*, the court limited access to a customer list to trial counsel, who happened also to be outside counsel. That customer list was, like that here, a target of the litigation. Here, however, the issue is whether the access of in-house counsel to the same sort of information, which is also a central aim of this litigation, ought to be restricted. Given the relationship among Mr. Kumar and in-house counsel, his influence over their activities and his intimate involvement

with their conduct of this litigation, the scales tip in favor of a protective order that restricts that access in the same way that Mr. Kumar's has been restricted.

### 4.
### Restricted Access Will Not Impair Autotech's Ability To Litigate The Case

The remaining factor to be considered is the impact of restricted access on Autotech's ability to pursue its claims. *United States Steel*, 730 F.2d at 1468; *Brown Bag Software*, 960 F.2d at 1470. Mr. Kumar has alleged that if Autotech is forced to utilize outside attorneys in addition to Mr. Fleischer because Messrs. Corn and Susler are denied access to ADC's confidential customer information, the "estimated" cost will be $1,000,000. (*Kumar Declaration*, ¶21). This conclusory allegation is made "upon information and belief." Apart from the striking absence of any explanation of the basis for the estimate or the source of the information from which the belief arose, it is clear that Mr. Kumar's statement is exaggerated and implausible.[5]

In order to run up $1,000,000 in fees, one lawyer at $500 per hour (or two lawyers at $250 per hour) would have to work *exclusively* for 2000 hours on matters related to production of the confidential information, which of course, is only a fraction of the discovery and the work involved in the case. One lawyer at $300 per hour would have to work *exclusively* for more than 3333 hours on matters relating to the confidential information. Obviously, as the hourly rate decreases, the number of billable hours required to reach the $1,000,000 figure increases. According to published surveys, average, annual billable hours for lawyers across the nation range from 1600 to 2000, with

---

[5] The implausibility of testimony is a factor in determining credibility. *See Rogers v. Barnhart*, 2006 WL 2246868 at *16-17 (N.D.Ill. 2006)(collecting cases)..

approximately 1600 being the average number in the Chicagoland area.[6] It is unpersuasive (if not disingenuous) to claim that whatever work needs to be done in connection with the confidential customer information produced by ADC will require a lawyer to devote anywhere from one to two years of his time to the project and to do so on an exclusive basis to the exclusion of all else.

Significantly, Autotech offers no *proof* that restricting its in-house counsels' access will impair its ability to prosecute its claims or defend against those of ADC. Mr. Kumar's declaration contains no such allegation. Perhaps there may be some enhanced costs if Mr. Corn and Mr. Susler do not have access to confidential information to which Mr. Fleischer will have unrestricted access. But there is no credible basis on which to estimate that cost, and there is no basis to conclude that whatever it may be it is beyond Autotech's capacity to absorb. For all one knows, Autotech may well have access to very substantial financial support from any number of backers – at least for the duration of this litigation. Mr. Kumar's affidavit is silent on the matter and is carefully crafted to leave the whole matter to speculation and to the drawing of unsupported inferences favorable to Autotech. But the burden to show severe and undue prejudice is Autotech's, and that burden cannot be satisfied by leaving the matter to conjecture.

Mr. Fleischer's statement that Mr. Corn and Mr. Susler's involvement is "cost effective for the client"– even if true – has essentially no meaning for purposes of the present motion. (*Fleischer Declaration*, ¶13). To the extent that Mr. Fleischer's declaration posits that the increased costs associated with exclusion of Mr. Corn and Mr. Susler would be "disastrous for Autotech," the statement is an unsupported conclusion by a testimonially incompetent witness and thus entitled to

---

[6] According to a survey in an article in the Chicago Daily Law Bulletin on August 1, 2006, the average partner in Chicago bills 1600 hours. In May 2005, the National Association of Legal Professionals Bulletin published statistics that ranged from 1600 to approximately 1900 average, annual, billable hours.

15

no weight. (*Compare* Rule 56(e), Federal Rules of Civil Procedure; Rule 602, Federal Rules of Evidence). Mr. Fleischer's statement in Autotech's memorandum that exclusion of in-house counsel will "put a significant strain on [Autotech's] already limited financial resources" is doubly deficient. (*Autotech's Memorandum*, at 4). Not only on the present record is he not a competent witness to make the assertion, but unsupported allegations in lawyers' briefs are not to be considered. *See IFC Credit Corp v. Aliano Brothers General Contractors, Inc.*, 437 F.3d 606, 610-611 (7th Cir. 2006); *United States ex rel. Feingold v. AdminaStar Federal, Inc.*, 324 F.3d 492, 494 (7th Cir. 2003); *Car Carriers Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984); *Alioto v. Marshall Field's & Co.*, 77 F.13d 934, 935 (7th Cir. 1996).

Finally, most courts do not factor in the cost of outside counsel when assessing a party's ability to pursue its case despite restricting in-house counsel's access to discovery materials. The question, instead, is whether the party's ability to litigate through outside counsel will be impaired. *See Brown Bag Software*, 960 F.2d at 1471; *Intel Corp.*, 198 F.R.D. at 528-529. Requiring a party to rely on its competent outside counsel does not create an "undue and unnecessary burden." *Intel Corp.*, 198 F.R.D. at 529. "[I]n view of retained counsel's competence, it is not clear how [Autotech's] position will be prejudiced by excluding [in-house] counsel from access. . . ." *A. Hirsh Inc.*, 657 F.Supp. at 1305. *See also Vardon Golf Co., Inc. v. BBMG Golf, Ltd.*, No. 91-0349, 1991 WL 222258, *2 (N.D.Ill. Oct. 24, 1991)(Conlon, J.)(no hardship to "one man company" if forced to retain outside counsel).

In *Brown Bag*, for example, no impairment was found where outside counsel had sufficient time and resources to review confidential materials and was presumably competent to evaluate the information. *Brown Bag*, 960 F.2d at 1471. Similarly, in *Intel Corp.*, there was no showing that in-

house counsel's restricted access would somehow hinder outside counsel's handling of the case. *Intel Corp.*, 198 F.R.D. at 528-529. Autotech is privileged to have an almost 25-year relationship with an outstanding lawyer whose firm has ample resources to assist him – if indeed any assistance is needed – in the very narrow and limited area of endeavor from which Mr. Corn and Mr. Susler are excluded. In fact, two members of Mr. Fleischer's firm have filed appearances in this case.

Although Mr. Corn claims in his declaration to be lead counsel, and Autotech refers to both Mr. Corn and Mr. Susler as the lead attorney (*Autotech's Memorandum*, at 3-4), both men report to and take their direction from Mr. Fleischer, and it is plain that they function as his associates. Just as labeling something a business, does not make it a business, *King v. Federal Bureau of Prisons*, 415 F.3d 634, 636-637 (7th Cir. 2005), and calling a building personalty, does not transmute its essential character, *In re TCI Ltd.*, 769 F.2d 441, 447 (7th Cir. 1985), calling Mr. Corn and/or Mr. Susler lead counsel is not decisive and does not preclude entry of a protective order that prohibits their exposure to confidential customer information. Here as always, "[w]hat controls our judgment. . . is the underlying reality rather than the form or label." *W.B. Worthen Co. ex. rel. Board of Commissioners v. Kavanaugh*, 295 U.S. 56, 62 (1935)(Cardozo, J.). *See also DiSanto v. Pennsylvania*, 273 U.S. 34, 43 (1927)( "the logic of words should yield to the logic of realities.").

The reality is that Mr. Fleischer is the lead counsel in this case in the only sense that the term has significance and in the sense it is commonly understood. Mr. Fleischer managed the four-day-long preliminary injunction hearing before Judge Holderman; he led the defense in Georgia; he has been representing Autotech (or related entities) for 23 years; he has signed every filing in the case as well as supporting verifications. By contrast, Mr. Corn is new on the scene, and Mr. Susler is but a fairly recent arrival. Both are serving as Mr. Fleischer's associates in this case under his direction.

17

Mr. Fleischer enjoys an AV Martindale Hubbell rating. His listing states that he specializes in, among other things, "trade secrets law." His firm advertises itself as one of the 50 largest legal firms in Illinois: "A creative, growing, *full-service* law firm, C&T has worked for clients ranging from modest local establishments to national and international companies, from local family owned businesses to publicly owned corporations. The C&T attorney team is made of highly qualified and innovative legal professionals. Entrepreneurs themselves, C&T attorneys bring unique skills, spirit and vision into their client relationships." www.Chuhak.com. (Emphasis supplied).

In sum, under the circumstances of this case – which in many ways are truly singular– prohibiting Messrs. Corn and Susler from having access to confidential customer information will not impair Autotech's ability to conduct the litigation.

## CONCLUSION

Even if Mr. Corn and/or Mr. Susler could be deemed lead counsel – in the sense that they are performing the bulk of the day-to-day legal work – they still could be denied access to ADC's confidential customer information. The ultimate question in is whether there is an unacceptable risk of inadvertent disclosure. If that risk exists, a party may be compelled to obtain outside counsel, regardless of whether in-house counsel was playing a lead or subordinate role in the case. That risk is apparent in this case. Consequently, ADC's motion for a protective order limiting access to Mr. Fleischer and his firm is GRANTED. The parties are directed to draft an appropriate order reflecting this decision and the parties' previous concessions and agreements. The protective order must comply with *Citizens First Nat. Bank of Princeton v. Cincinnati Insurance. Co.* 178 F.3d 943 (7th Cir.1999).

ENTER: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 8/21/06

18