IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AUTOTECH TECHNOLOGIES LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| AUTOMATIONDIRECT.COM, INC., TIMOTHY HOHMANN and KOYO ELECTRONICS INDUSTRIES CO., LTD., | ) ) ) ) | |
| Defendants. ------------------------------------------------------- | ) ) | No. 05 C 5488 |
| AUTOMATIONDIRECT.COM, INC., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| AUTOTECH TECHNOLOGIES L.P., AVG ADVANCED TECHNOLOGIES, INC., SHALLI INDUSTRIES, INC., and SHALABH KUMAR, | ) ) ) ) ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

JAMES F. HOLDERMAN, Chief Judge:

In the summer of 2004, the business relationship of Autotech Technologies Limited Partnership ("Autotech") and AutomationDirect.com, Inc. ("ADC") began to sour. After more than four years of working together to manufacture and distribute operator interface panels for automation control systems, the parties went their separate ways. Now before this court, Autotech and ADC each claim, among other allegations, trademark rights in the words

1

"EZTOUCH" and "EZTEXT," which had previously been affixed to their common product.

Pending before the court are ADC's Motion for Summary Judgment as to the Trademark Claims of All Parties and for Entry of a Permanent Injunction (Dkt. No. 235) and Autotech's Cross Motion for Summary Judgment (Dkt. No. 256). For reasons stated below, both motions are denied.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When facing cross summary judgment motions, the court construes "all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *First National Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 971, 976 (7th Cir. 2007) (citations omitted). Issues related to trademark infringement, such as the protectability of a particular word or phrase or a likelihood of confusion, "may be resolved on summary judgment 'if the evidence is so one-sided that there can be no doubt about how the question should be answered.'" *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001) (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996)). In performing this analysis, it is not for the court to make credibility determinations or to weigh conflicting evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).

## BACKGROUND AND PROCEDURAL HISTORY

On September 8, 1999, Autotech and ADC entered into an agreement whereby ADC agreed to market and distribute certain automation control panels to be manufactured by Autotech ("the 1999 Agreement") (Declaration of ADC President Thomas C. ("Tim") Hohmann, Ex. 1). Pursuant to the terms of the 1999 Agreement, this line of products was to be "specifically designed for ADC," who was to be the exclusive distributor. (1999 Agreement ¶¶ 1.3-1.5). Although the parties now dispute whether Autotech or ADC was ultimately responsible for originating the marks EZTOUCH and EZTEXT, they agree that neither party employed the marks prior to 2000, when ADC began advertising the EZTOUCH and EZTEXT products pursuant to the 1999 Agreement. The first products were not sold under the EZTOUCH and EZTEXT marks until early 2001.

For approximately four years, the contractual relationship between the parties appears to have worked well for both businesses.[1] In June, 2004, however, ADC informed Autotech that it did not intend to extend the 1999 Agreement, and the 1999 Agreement expired according to its terms on December 31, 2004. During the latter half of 2004 and early 2005, as their joint business relationship began to dissolve, Autotech and ADC each sought registration of the marks EZTOUCH and EZTEXT with the United States Patent and Trademark Office ("PTO").[2] The

---

[1] A 2002 addendum to the 1999 Agreement addressed Autotech's use of the same Graphical User Interface as that used in the EZTOUCH panels in a different line of products (called "G Squared" and "Q Squared"). (*See* Hohmann Decl., Ex. 12).

[2] On July 1, 2004, Autotech's sister company, AVG Advanced Technologies ("AVG"), filed U.S. App. No. 78/444,916 for the mark EZTOUCH. Shortly thereafter, on July 16, 2004, ADC submitted U.S. App. No. 76/602,557 for the mark EZTOUCH. AVG's application was refused by the PTO on May 23, 2007, on the grounds that the mark is merely descriptive. ADC's application was suspended in September, 2005, in part pending the outcome of this lawsuit.

parties also filed lawsuits against one another, which have been consolidated before this court.[3]

After the expiration of the 1999 Agreement, and pursuant to an agreement signed on November 12, 2004, ADC continued to use the EZTOUCH and EZTEXT marks for purposes of selling its remaining inventory. (*See* Hohmann Decl. ¶ 41, Ex. 38) ("the 2004 Agreement"). At the same time, the parties explicitly acknowledged their ongoing dispute over ownership rights in the alleged EZTOUCH trademark. (2004 Agreement ¶ 1.4). In September, 2005, ADC launched its C-more product line to replace the EZTOUCH line of products. In its catalog and online, ADC has referred to certain EZTOUCH and EZTEXT products as "no longer available" "obsolete" and "discontinued." (*See* Declaration of Autotech President Shalabh Kumar ¶ 31, Ex. 12; Hohmann Decl. ¶ 56, Ex. 50). ADC also invited its customers to "consider our next generation EZTouch compatible C-more touch panel." (Kumar Decl. ¶ 31, Ex. 12).

---

Regarding the EZTEXT mark, AVG filed U.S. App. No. 78/474,446 for the mark EZTEXT on August 26, 2004, while ADC submitted U.S. App. No. 78/575,386 for the mark EZTEXT on February 25, 2005. The PTO published AVG's mark for comment in August, 2005, and ADC filed its opposition to the registration of AVG's mark. ADC's opposition to AVG's registration of the mark EZTEXT has been pending before the Trademark Trial and Appeal Board since October 7, 2005. Meanwhile, ADC's own application was suspended on March 20, 2006, again in part pending the outcome of this litigation.

[3] On April 11, 2005, ADC filed a lawsuit in the Northern District of Georgia (case number 05 CV 961), alleging that Autotech had engaged in false advertising, copyright infringement, trademark infringement, unfair competition, and deceptive trade practices. Five months later, on September 15, 2005, Autotech filed a lawsuit in the Circuit Court of Cook County against ADC (case number 05 CH 15714), alleging breach of contract, breach of fiduciary duties, aiding and abetting the breach of fiduciary duties, and fraudulent misrepresentation. The Illinois case was removed to the Northern District of Illinois on September 23, 2005, and assigned case number 05 C 5488. On January 12, 2006, after a detailed discussion of the relevant factors, the Northern District of Georgia ordered case number 05 CV 961 transferred to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a), where it was consolidated with case number 05 C 5488.

Meanwhile, in January, 2005, Autotech launched a new business under the trade name "EZAutomation," through which it has marketed a variety of operator interface products under the names EZTOUCH ENHANCED, EZTEXT ENHANCED, EZ TOUCHPLC, EZ TEXTPLC, and EZ TOUCHSCREEN. (Hohmann Decl. ¶ 43, Ex. 39; Kumar Decl. ¶ 21). On its website, Autotech compares the EZTOUCH ENHANCED product to the version of the EZTOUCH product sold by ADC, and compares the EZTEXT ENHANCED product to the version of the EZTEXT product sold by ADC.

## LEGAL ANALYSIS

ADC seeks summary judgment in its favor with respect to five of its counterclaims:[4] (Counterclaim #7) federal unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (Counterclaim #9) common law trademark infringement and unfair competition, pursuant to Georgia and Illinois law; (Counterclaim #10) unfair and deceptive trade practices, pursuant to the Georgia and Illinois Uniform Deceptive Trade Practice Acts, O.C.G.A. §§ 10-1-370 *et seq.*, and 815 Ill. Comp. Stat. 510/1 *et seq.*; (Counterclaim #11) state trademark infringement under O.C.G.A. § 10-1-450; and (Counterclaim #12) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq*. Furthermore, ADC also seeks summary judgment in its favor on Autotech's claim for trademark infringement pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count IX).

Autotech, in its cross motion for summary judgment, seeks a declaratory judgment that ADC does not possess any trademark rights in the marks EZTOUCH and EZTEXT, in

---

[4] ADC's counterclaims are asserted against Autotech, AVG, Shalli Industries, Inc., and Shalabh Kumar (President of Autotech).

accordance with Autotech's claim for trademark infringement (Count IX). At the same time, however, Autotech specifically requests that this court *not* determine issues of trademark enforceability, instead voicing a preference that the United States Patent and Trademark Office ("PTO") make the determination whether the alleged marks are protectable under federal trademark law.

Because the question of ownership has the potential to affect the scope of the court's further analysis, the court begins with the question of which party owns the rights to the alleged trademarks. Unfortunately, the Seventh Circuit's law on trademarks has not addressed this issue with great frequency.

Looking to other courts that have considered the issue, the court finds that generally, "the question of ownership of a trademark as between the manufacturer of a product to which the mark is applied and the exclusive distributor of that product is a matter of agreement between them." *Energy Jet, Inc. v. Forex Corp.*, 589 F. Supp. 1110, 1116 (D.C. Mich. 1984); *see also Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996). In this case, however, the question of trademark ownership was not addressed by the parties in the 1999 Agreement.[5] Furthermore, the parties explicitly noted their *disagreement* on the question of trademark ownership in the 2004 Agreement. (2004 Agreement ¶ 1.4). Because there is no controlling agreement on the issue of ownership, the court must rely on other evidence to

---

[5] The court is not persuaded by Autotech's argument that the indemnification clause of the 1999 Agreement indicates an agreement as to Autotech's ownership of the alleged trademarks. This clause states that Autotech will indemnify ADC against claims "related to the design and manufacturing of the Products, including [Autotech] developed documentation and software for breach of or infringement of patent and intellectual property rights." (1999 Agreement ¶ 2.8). On its face, this clause appears to refer to third party claims brought against ADC.

ascertain the owner of any potential trademark rights.

The court begins with the general presumption that ownership lies with the manufacturer. *Sengoku Works*, 96 F.3d at 1220. However, where the "goods pass through [the distributor's] hands in the course of trade and [the distributor] gives them the benefit of [its] reputation or of [its] name and business style," the presumption in favor of the manufacturer can be rebutted. *Victor Tool & Mach. Corp. v. Sun Control Awnings, Inc.*, 299 F. Supp. 868, 874 (E.D. Mich. 1968). In determining which party has superior ownership rights, courts look to a number of factors, including (1) which party invented or created the mark; (2) which party first affixed the mark onto the product; (3) which party's name appeared on packaging and promotional materials in conjunction with the mark; (4) which party exercised control over the nature and quality of the goods on which the mark appeared; (5) which party was viewed by customers as standing behind the goods, *e.g.* the party that received customer complaints; and (6) which party paid for advertising and promotion of the trademarked product. *Thermion, Inc. v. Thermion Metalizing Sys., Inc.*, 423 F. Supp. 2d 1146, 1152 (W.D. Wash. 2006) (quoting McCarthy § 16.48); *see also Wrist-Rocket Mfg. Co. v. Saunders*, 379 F. Supp. 902, 909 (D. Neb. 1974) ("*Wrist-Rocket I*"), *aff'd in part, rev'd in part*, 516 F.2d 846 (8th Cir. 1975) ("*Wrist-Rocket II*"); *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001); *Omega Nutrition U.S.A., Inc. v. Spectrum Mktg., Inc.*, 756 F. Supp. 435, 438-39 (N.D. Cal. 1991). As the Third Circuit has recognized, "[t]he decisive question is not who manufactured the article sold under a given trademark, but which business or article is symbolized by it." *Premier Dental Prods. Co. v. Darby Dental Supply Co., Inc.*, 794 F.2d 850, 854 (3d Cir. 1986) (quoting Callmann, *Unfair Competition, Trademarks and Monopolies* § 17.16 (4th ed., 1981)). The court analyzes each of

these factors in turn.

A.      Which Party Invented or Created the Marks

ADC asserts that its President, Thomas C. (Tim) Hohmann ("Hohmann"), originated the names EZTOUCH and EZTEXT to refer to the touch screen and text-screen products sold pursuant to the 1999 Agreement. (Hohmann Decl. ¶ 12). Hohmann attests that "I personally thought up these trademarks and we evaluated them along with other possible names developed by ADC." (*Id.*). In support of this argument, ADC submits a chain of emails showing the development of EZTOUCH and EZTEXT names and logos by ADC artist Jamie Hipple. (Hohmann Decl., Ex. 7-8).

Autotech President Shalabh Kumar ("Kumar") agrees that "it may probably be true that Timothy [sic] Hohmann first came up with the exact specific name 'EZTouch,'" but Kumar also emphasizes that the overall development of the mark was a "joint effort." (Kumar Decl. ¶ 7). Furthermore, Kumar attests that "ADC did not come up with the name EZText, I did." (Kumar Decl. ¶ 7).

At the summary judgment stage, it is not the court's role to weigh competing evidence. Because it is a disputed question of fact whether either ADC or Autotech was ultimately responsible for originating the marks in question, the court finds that this factor cannot weigh in favor of either party's ownership rights to the disputed marks, at this point in the proceedings.

B.      Which Party First Affixed the Marks onto the Product

Unlike traditional trademarks, the marks EZTOUCH and EZTEXT are not affixed to the operator control panels themselves or to the packaging of the products. (Hohmann Supp. Decl. ¶ 8). Rather, the marks are used to promote the products in both print catalogs and online

advertising, and are also displayed in user manuals and on the software start-up screens of the products. (*Id.*). In this case, ADC argues that it was the first to use the marks EZTOUCH and EZTEXT in commerce because it promoted the products by these names in ADC's 2000 catalog and on the homepage of ADC's website. On the other hand, Autotech argues that it was first to affix the marks to the products' user manuals and software.

It is clear to the court that Autotech and ADC each made use of the marks in accordance with their respective rights and obligations, as outlined in the 1999 Agreement. As in *Omega Nutrition*, the first use of the marks was a joint effort between the parties. *Omega Nutrition*, 756 F. Supp. at 438 ("[the manufacturer] does not even argue that this first use took place *independently* of [the distributor]") (emphasis in original). ADC's use of the marks for advertising purposes was not independent of the 1999 Agreement with Autotech. Instead, both parties agreed that ADC would engage in this type of advertising for their mutual benefit.

Because the EZTOUCH and EZTEXT marks were first used for the benefit of both parties, the court finds that this factor does not weigh in favor of either party on the question of ownership.

C.  Which Party's Name Appeared in Conjunction with the Marks

Throughout its promotional literature, ADC generally refers to the EZTOUCH and EZTOUCH products in a possessive manner. For example, ADC's 2000 catalog states "We are proud to introduce our new line of operator interface panels: EZText and EZTouch panels." (Hohmann Decl. ¶ 22, Ex. 13). ADC also advertised that "We named our panels EZTouch because they are the easiest to configure." (Hohmann Decl. ¶ 22, Ex. 14). ADC regularly ran advertisements comparing "ours" (AutomationDirect) versus "theirs" (*e.g.* Allen-Bradley).

9

(Hohmann Decl. ¶ 22, Ex. 15). While ADC's catalog also includes a boilerplate disclaimer, stating "All product names, trademarks, and registered trademarks are the property of their respective manufacturers. AutomationDirect disclaims any proprietary interest in the marks and names of others," (Kumar Decl. Ex. 4), the court finds that the use of the designation "others" in conjunction with the "ours vs. theirs" comparison indicates no intent to disclaim ownership in the EZTOUCH and EZTEXT marks.

At the same time, ADC also highlighted the fact that AVG (Autotech's sister company) designed the EZTOUCH and EZTEXT line of products exclusively for ADC. (Hohmann Decl. ¶ 23; Kumar Decl. ¶ 8). For example, the 2000 catalog emphasized that ADC worked together with AVG to design the new PLC touch panels, stating "Since these products were designed from scratch to be marketed and sold by Automationdirect.com, our standards were high." (Kumar Decl. ¶ 8, Ex. 2b). The EZTEXT advertisements similarly spoke of AVG's role in designing and manufacturing that product. (Hohmann Decl. ¶ 23, Ex. 19) ("Since [AVG] did such a great job designing and manufacturing the world's most practical touch panels exclusively for us, it only made sense that we ask them to design the world's most practical text panels.").

ADC's house trademark appeared on every page of the user manual and on the start-up screens for the software run on the EZTOUCH and EZTEXT products. (Hohmann Decl. ¶¶ 25, 27, Ex. 21-23, 25-27). The shipping labels emphasized that the products were "Sold by Automationdirect.com" and "Manufactured in USA by AVG." (Hohmann Decl. ¶ 25, Ex. 24). Similar labels appeared on the products themselves. (Ex. 25 at p. 29, 49). As mentioned above, neither the products nor the packaging utilized the alleged trademarks themselves.

Both parties cite to *Omega Nutrition* in support of the argument that these uses of the marks require a finding of ownership in their favor. In *Omega Nutrition*, the district court held that the parties' use of the mark in question did not overcome the presumption of ownership that was conferred upon the distributor when the distributor registered the mark with the PTO. *Omega Nutrition*, 756 F. Supp. at 439. Relevant to this issue, the court noted that the labels on the product "prominently featured [the distributor's] brand name and logo directly above the trademark, while the only mention made of [the manufacturer] was in tiny print in the lower left hand corner of the label." *Id.* In this case, the advertising and use of the marks makes abundantly clear that (1) the products were manufactured by Autotech (AVG), and (2) that ADC was the exclusive distributor of the products. Unlike in *Omega Nutrition*, in conjunction with the use of the EZTOUCH and EZTEXT marks, *both* parties' identities and roles are consistently emphasized. Neither logo or name is more or less prominent than the other, as they are both similarly sized and situated in the text and on the labels.

This factor again does not weigh in favor of either Autotech or ADC.

D.  Which Party Exercised Control over the Nature and Quality of the Goods

According to the terms of the 1999 Agreement, Autotech was contractually responsible for manufacturing the goods in question. (1999 Agreement ¶ 5.1). However, ADC argues that it contributed significantly to both the design of the EZTOUCH and EZTEXT products and the continued oversight of the products' quality. For example, ADC asserts that it contributed to the original design of the products at the outset by generating at 28-page set of specifications for the new line of operator interface panels. (Hohmann Decl. ¶ 9, Ex. 2). Autotech flatly disputes this assertion, arguing that "ADC simply copied [Autotech's specifications for an earlier product]

11

word-by-word and resent them to Autotech as June 1999 specifications of the new panels to be designed for the ADC marketing channel." (Kumar ¶ 36). Nonetheless, it is undisputed that ADC did have some input in the specifications it wished to see incorporated into the new products. (*See* Autotech's Response to ADC's Statement of Undisputed Material Facts, Dkt. No. 251 ("Autotech Resp.") ¶ 41).

ADC also participated in product testing and evaluation, although the parties dispute the usefulness of ADC's list of 130 deficiencies found in the EZTOUCH prototype. (Hohmann Decl. ¶ 10, Ex. 3-4; Kumar Decl. ¶ 37-38). However, in a December 22, 2000 email to Hohmann, Kumar praised ADC's efforts, stating "AVG expresses its gratitude to ADC for jumping in to help test the product. I am once again stating the fact in writing that ADC has gone way beyond the call of its duty in helping AVG develop the EZ Touch." (Hohmann ¶ 11, Ex. 5).

The parties agree that ADC fielded warranty claims for the EZTOUCH and EZTEXT products, while Autotech was ultimately responsible for providing repair, replacement or credit to both ADC and its customers. (*See* 1999 Agreement ¶¶ 2.5-2.6; Hohmann Decl. ¶ 30; Kumar Decl. ¶ 18; Autotech Resp. ¶ 49). Autotech and ADC often communicated with each other about warranty problems, defect rates, and other quality issues. (*See* Autotech Resp. ¶¶ 51-52.).

Although the undisputed evidence tends to show that ADC was involved in issues of quality control, this does not necessarily mean that ADC "bore the brunt of the responsibility of maintaining the quality of the product." *Omega Nutrition*, 756 F. Supp. at 439. On the contrary, the court finds that the back-and-forth communications between Autotech and ADC suggest (again) a joint effort between the parties. (*See, e.g.,* Hohmann Decl. ¶ 32, Ex. 31). While "ADC

monitors and reports defects to its manufacturers," (Hohmann Decl. ¶ 32), it is clear that Autotech was the party responsible for coming up with solutions to correct these defects. Unlike in *Omega Nutrition*, ADC has not produced "an impressive array of evidence" that ADC had the power to "demand" the correction of product defects or that Autotech was required to inform ADC before making changes to the manufacturing process.

At the same time, it is entirely possible that ADC was ultimately responsible for the quality of the EZTOUCH and EZTEXT products. The resolution of disputed questions of fact regarding ADC's involvement at the initial product development and testing stages may shed some light on this issue. The court therefore finds this factor cannot be resolved in favor of either party on summary judgment.

E.      Which Party Was Viewed by Customers as Standing Behind the Goods

It is clear that ADC was the initial customer contact point for the EZTOUCH and EZTEXT panels. (Autotech Resp. ¶ 46). Specifically, customers were directed to call or fax ADC for issues of technical support, or to visit ADC's website. (ADC's Statement of Undisputed Material Facts, Dkt. No. 237 ("ADC's SMF"), ¶ 47). Customers seeking in-warranty repairs were also directed to contact ADC. (ADC's Reply to Autotech's Statements of Additional Facts, Dkt. No. 273 ("ADC Reply"), ¶ 47). However, all out-of-warranty repairs were directed to Autotech. (*Id.*). In its 2004 and 2005 reader surveys, Control Design magazine ranked ADC as one of the leaders in operator interface service and support. (Hohmann ¶ 29, Ex. 30). Neither Autotech nor any of its affiliates was recognized in these surveys.

Autotech points to statements posted on ADC's customer forum recognizing that Autotech (AVG) is the manufacturer of the EZTOUCH panels as evidence that customers looked to

13

Autotech as standing behind the quality of the EZTOUCH and EZTEXT products. (*See* Kumar Decl. ¶ 28, Ex. 11). However, many of these comments refer to both ADC and Autotech as sources of repair. (*E.g.*, "I tried to buy a spare back light but Automationdirect does not sell it, they told me to contact the manufacturer AVG." (Ex. 11, p. 6); "I bet it will [sic] very easy for Automationdirect to get it and sell it as a spare part." (Ex. 11, p. 7); "Anyone at AD or AVG want to comment on the possibility of a replacement bulb?" (Ex. 11, p. 9)). At most, the website tends to show that the customers viewed the ADC online forum as a way to get answers from both ADC and Autotech as to issues regarding quality.

Autotech points out that it was contractually obligated to maintain the approval of Underwriters Laboratories, (1999 Agreement ¶ 2.7), and argues that "[a]nybody who calls Underwriter Laboratories is told that the products have been approved because the manufacturer went through a process to have its products approved and that the manufacturer, Autotech, is approved and certified to manufacture the products for consumer safety." (Dkt. No. 305 at 12). The court is not persuaded by this line of argument, as any relationship between agency approval and the consuming public's association of Autotech with the alleged trademarks is tenuous, at best. Furthermore, this was a contractual duty assigned to Autotech for the benefit of both parties.

The evidence before the court indicates that both Autotech and ADC worked with customers on issues of quality control. While ADC may have been the first place that a majority of customers would have turned for assistance with the EZTOUCH and EZTEXT panels, Autotech was certainly a known entity to customers, as well. Once again, this factor requires a precision of balancing and weighing of the evidence that is inappropriate on summary judgment.

F.     Which Party Paid for Advertising and Promotion of the Product

It is undisputed that the parties created a joint account that made funds available for advertising and promotions. (*See* 1999 Agreement ¶¶ 6.1-6.5). At the outset, each party contributed $150,000 to this joint account. (*Id.* ¶ 6.1). Subsequent contributions were made by ADC pursuant to a formula whereby ADC invested a portion of the gross sales in the account. (*Id.*). Autotech also contributed approximately $80,000 to the account based on a percentage of its sales of G*Squared and Q*Squared products. (Hohmann Decl. ¶ 18).

Over the course of the 1999 Agreement, ADC asserts that it paid all expenses associated with its catalog and website, as well as approximately $500,000 on trade show attendance and displays. (Hohmann ¶¶ 16, 20). ADC also claims that it made over $2,000,000 in payments to advertisers for trade media advertising EZTOUCH and EZTEXT products, but was reimbursed for only $1,400,000 of these payments through the joint account. (Hohmann ¶ 18).

Noting Autotech's share of ownership in the joint account, Kumar attests that "Autotech paid $1,250,000 from the investment account for advertising that was Autotech's share of the expense. ADC spent approximately the same amount for advertising and promoting the products." (Kumar Decl. ¶ 31). Autotech argues that it has spent significantly more on advertising than ADC since the termination of the 1999 Agreement. However, because the question before the court is which party had ownership of the EZTOUCH and EZTEXT marks at the time the alleged infringement began, Autotech's post-dissolution figures are not relevant.

It appears that the specific figures regarding advertising payments are disputed between the parties. ADC does not suggest a dollar figure for its catalog and website expenses, but it does

15

assert that it spent an un-reimbursed $1,100,000 for trade shows and trade media advertising. On the other hand, it is unclear whether Autotech argues that ADC spent $1,250,000 of its own money (plus $1,250,000 from the joint account), or whether Autotech is arguing that ADC was actually reimbursed $2,500,000 from the joint account ($1,250,000 of which would have been Autotech's "share" and $1,250,000 of which would have been ADC's "share").

It is difficult for the court to determine on the evidence before it whether ADC contributed more to the advertising and promotion of EZTOUCH and EZTEXT than it was reimbursed from the joint account. Neither party has submitted financial documents in support of their arguments. Because this is a disputed question of fact, the court finds that this factor does not weigh in favor of either party.

## SUMMATION

As the above analysis demonstrates, at this point in the proceedings the court cannot determine the question of ownership of the EZTOUCH and EZTEXT marks. While summary judgment is appropriate "if the evidence is so one-sided that there can be no doubt about how the question should be answered," *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001), in this case questions of disputed fact and the need to balance undisputed facts preclude the granting of summary judgment for any party. The questions of fact in this case are best left for resolution at trial.

The court notes that it remains an open question whether either mark is protectable under federal trademark law. Both EZTOUCH and EZTEXT appear to be descriptive marks, as the PTO found in May, 2007, when evaluating AVG's application for EZTOUCH. Confusingly, it seems that Autotech has now changed its position on trademark infringement, stating in its March

22, 2007 filing that "the trademark EZTouch is not protectable" because "the names appear to be generic." (Dkt. No. 288 at 2). This directly conflicts with Autotech's earlier argument that "[s]econdary meaning is clearly in favor of Autotech." (Dkt. No. 252 at 12). On the other hand, ADC has consistently argued that secondary meaning has been developed by the marks, such that consumers think of ADC as the source of the products associated with these marks. In support of its argument, ADC has relied on evidence of advertising expenditures and sales revenue as stated in the Hohmann Declaration, but ADC has not produced any documentary evidence in support of its figures. ADC has also failed to identify which portion of advertising funds was spent on advertising the EZTOUCH mark as compared to the EZTEXT mark. To succeed with its trademark claims, ADC will at some point need to sufficiently establish that the alleged trademarks have indeed acquired secondary meaning.

Finally, the court notes that it is unpersuaded by Autotech's argument that ADC has abandoned its use of the marks at this time. Both marks are currently used by ADC to sell its remaining inventory of operator interface panels that were manufactured by Autotech. This constitutes a *bona fide* use of the alleged marks. *See Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 937-38 (9th Cir. 2006). There is no evidence before the court that ADC has actually discontinued its use of either mark, therefore there can be no abandonment at this time.

## CONCLUSION

For the reasons stated above, ADC's Motion for Summary Judgment as to the Trademark Claims of All Parties and for Entry of a Permanent Injunction (Dkt. No. 235) and Autotech's Cross Motion for Summary Judgment (Dkt. No. 256) are both denied.

ENTER:

_____
JAMES F. HOLDERMAN
  Chief Judge, United States District Court

Date:   August 17, 2007