IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AUTOTECH TECHNOLOGIES LIMITED PARTNERSHIP,  )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>AUTOMATIONDIRECT.COM, INC., )<br>TIMOTHY HOHMANN and KOYO )<br>ELECTRONICS INDUSTRIES CO., LTD. )<br>)<br>Defendants. )<br>_____ )<br>)<br>AUTOMATIONDIRECT.COM, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AUTOTECH TECHNOLOGIES L.P., )<br>AVG ADVANCED TECHNOLOGIES, INC., )<br>SHALLI INDUSTRIES, INC., and )<br>SHALABH KUMAR, )<br>)<br>Defendants. ) | No. 05 C 5488<br><br>Chief Judge Holderman<br><br>Magistrate Judge Cole |

### MEMORANDUM OPINION AND ORDER RE: AUTOTECH'S MOTION TO COMPEL DISCOVERY REGARDING CUSTOMER INFORMATION

The Court: [The dispute over the production of computer information is] certainly going on and on and on and on.

ADC: Well, let me explain what's been going on and on and on and on –

Court: Hold it . . . it's Autotech's motion.

                            \*      \*      \*

Autotech: Your honor, it has been going on and on and on and on. . . .
(Hearing Transcript of 6/6/07).

Although the issue of the extraction of the information goes back to February 26, 2007, the passage of seven months has not seen its resolution. In this episode of the saga, Autotech again seeks an order compelling ADC to produce discovery regarding "customer information," which apparently is contained in some 60,000 invoices stored in electronic format in ADC's computer database. The history of this dispute gives point to the quip made by ADC's counsel who said that despite ADC's willingness to produce the information, "Autotech won't take *yes* for an answer." Essentially, the parties were, and continue to be at odds over whether ADC has already produced the information that would be contained in those invoices in another form. ADC insists that it has done all it possibly can do to satisfy Autotech and continues to offer its utmost cooperation. According to Autotech, ADC has made no good faith attempt to produce the information and is thwarting court orders and instructions in the process.

In February, 2007, ADC had indicated to Autotech that it was too burdensome to extract information regarding 56,000 to 60,000 customer invoices from their computer system. It would involve perhaps 3000 man-hours at a cost of $40,000 to $60,000. (Hearing Transcript of 2/26/07 at 16-17, 21, 24-25). Autotech insisted that it was simplicity itself to extract the information, that there should be no cost, and that ADC was opposed to producing the information. ADC insisted that it was perfectly willing to produce the information so long as it did not have to absorb all the costs. (ADC's Response Brief, Ex. 2, Tr., at 32-33).

In light of ADC's willingness to produce the information, and Autotech's seeming equivocation, I posed the question to Autotech's counsel suggested by ADC's lawyer: "And my question to you is I want to see if you will take yes for an answer?" He responded: "Yes." *Id.* But just moments later, there appeared to be some slippage in Autotech's position, and it insisted that

the information be extracted through the use of a specific program. (Tr., at 33-34). In the end, although there were some intermediate objections to the process, it was agreed that Autotech would pay the reasonable costs of extracting the information. (Tr. 33). All was – or seemed – well. It was not to be.

Just a few weeks after the hearing, on March 13, 2007, (Dkt. #279), Autotech filed a motion for sanctions, along with a motion to compel production of the customer information at issue. I denied the motion as moot given the agreement the parties had reached at the February 26, 2007 hearing. (Dkt. # 299, 304). I also ordered ADC to promptly provide an estimate of the cost of extracting the information from its computer system.

ADC wrote to Autotech on March 29, 2007 and included various estimates, which now totaled $80,000 for generating about 180,000 documents, and printing them at 32 cents apiece. (*Brief of ADC in Response*, Taylor Decl. ¶ 5, Ex. 1; *Memorandum of Autotech in Support of Its Motion*, Ex. 3, at 25). Autotech did not reply to the letter. (*Brief of ADC in Response*, at 6; *Memorandum of Autotech in Support of Its Motion*, Ex. 3, at 25). It had what it thought was a much better idea. Autotech filed yet another motion to compel and for sanctions on June 4, 2007, and the parties were back before me on June 6, 2007. They seemingly had made no progress since ADC submitted the cost estimates to Autotech, more than two months earlier. But Autotech had used that time to come up with a plan and a visual aid to explain it:

> Autotech: We have been telling the other side ever since I have been involved in this case that it's a matter of running a simple search on a program. We actually got a DVD with the motion showing it takes 2 minutes and 40 seconds to run this search that we are asking for. And so you know, having not gotten it resolved at this point of time, we filed a motion.

\* \* \*

> All we really need to do, your Honor, is have somebody sit down at the computer console and put in these key stokes that we have outlined and see if it produces the report we are looking for. If it doesn't, then maybe $80,000 –

(Hearing Transcript of 6/6/2007, at 10, 19). The use of a program of its choosing is the approach Autotech advanced at the February 26th hearing.

The fact that a specific program, once rejected, was again part of the mix was news to ADC. The agreement the parties had been operating under for the extraction of the information had only one open term: the cost. After ADC provided estimates, the only issue ought to have been how much Autotech would pay. Autotech had never mentioned the "simple search on a program" in the negotiations leading up to the June 4th motion to compel and for sanctions. (Hearing Transcript of 6/6/2007, at 12-13). From ADC's representations at the hearing – representations that Autotech did not challenge – it is clear that Autotech did not even broach this new topic with ADC. (Hearing Transcript of 6/6/2007, at 13-14).

What that means is that Autotech filed its June 4th motion in violation of both Federal and Local Rules requiring that the parties confer in good faith in an effort to secure the discovery at issue without court intervention. Fed.R.Civ.P. 37(a)(2); Local Rule 37.2. True, Autotech provided a certification along with its motion, but it is an empty form if Autotech does not actually confer in good faith with its opponent. Thus the motion could have been denied for failure to comply with both rules. *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1059 (7th Cir. 2000).[1] Instead, the negotiations regarding the implementation of this "simple search program" – negotiations that Autotech should have initiated before filing its motion – occurred at the hearing. Nonetheless, the

---

[1] Noncompliance with local rules has caused Autotech difficulties in this and other cases. *See* Minute Order of 6/29/07 (Docket 355); Minute Order of 8/24/07 (Docket 388); *Autotech Technologies LP v. Integral Research & Development Corp.*, 2007 WL 2429480 (7th Cir. 2007).

4

approach was not rejected out of hand:

> The Court: Now you come up with what [ADC] calls a new way to something different and maybe that's a good way to do it. Maybe that solves all the problems.
>
> \* \* \*
>
> The question then is why should we not try to do what this gentleman says you should do and see what the result is.
>
> ADC: We're happy to do that. We had no opportunity to do that before showing up today. We didn't even have the materials that were necessary, but we are willing to do it and we will come back.

(Hearing Transcript of 6/6/2007, at 20-21). Autotech then provided ADC with the search program DVD, and a deal was worked out, or so it seemed:

> ADC: We are perfectly willing if this works to do it this way. It's not a way that we had thought of, heard of, or believed, based on what we have been able preliminarily to look at. We don't think it will work on their system.
>
> We can do one of two things. We can have Mr. Spiller [of ADC] try to follow and work through these steps and see if it will run, but then they will have questions about was Mr. Spiller really making a good go of it and acting in good faith, or if you think that an outside computer expert wants to come down to Georgia tomorrow and sit down on that computer and see if he can make this happen, let him do it.
>
> The Court: What could be better than that?
>
> ADC: Exactly.
>
> The Court: I mean, that's a fair offer.
>
> Autotech: And I accept that offer....

(Hearing Transcript of 6/6/2007 at 22).

Pursuant to this agreement, Autotech's attorneys hired two technology and database experts, Leon Bouknight and Craig Barnes, to extract the relevant data from ADC's computer systems. ADC and Autotech set a date for June 13, 2007. Following the hearing, the parties exchanged emails to

5

confirm the event and its parameters. Autotech indicated that it would be sending an attorney and two independent contractor computer technicians. (*Autotech's Memorandum in Support*, Ex. 8). The two technicians "would access the ... database to retrieve the following information: customer name, address, invoice number, invoice date, part number, product description, quantity shipped and price for all products in the EZTouch and EZText lines." (*Id.*). Autotech suggested that they also retrieve the same information about C-More products – information that was then the subject of another motion to compel. In response, ADC confirmed the procedure, but demurred at the proposal to extract C-More data as well. (*Id.*). ADC explained that "[i]f the proposed method for retrieving the information outlined below actually works, our client's IT people will be observing and will know how to do the same procedure in the future . . . ." (*Id.*).

Things did not go smoothly on June 13th. The procedure was not as simple as Autotech advertised, and ADC, it can be argued, was perhaps not as cooperative as it suggests. In short, the exercise did not work According to ADC, Autotech's computer technicians were unfamiliar with the computer search program that Autotech had touted at the hearing – they had never seen the DVD. (*Brief of ADC in Response*, Taylor Decl., ¶ 7). That made impossible fulfillment of Autotech's promise that the information could be extracted in less than three minutes by following the "key strokes that [Autotech] outlined [in the DVD]." Additionally, Autotech was aware that it was not going to have unfettered access to ADC's database – that had been made clear at the February 26th hearing and at every subsequent discussion.

According to Autotech, however, ADC took that to the extreme. Autotech's technicians were not allowed to touch the computer – they had to relay instructions through one of ADC's employees. That was not what ADC had agreed to at the hearing – counsel said the outside experts could sit

6

down at the computer – or in subsequent emails – ADC technicians would simply observe. In addition, ADC understandably did not allow any deviation from the steps in the DVD. (*Autotech's Memorandum in Support*, at 4-5; *Autotech's Reply Brief*, Ex. 7, Barnes Decl., ¶ 4). ADC claims that this was owing to the fact that the system was a "live" system, running ADC's business, and ADC was leery of trial and error experimentation on its system. (*Brief of ADC in Response*, Taylor Decl., ¶ 8; Marchuk Decl. ¶ 4-5).

This is somewhat understandable, although, given the manner in which computer data systems vary, ADC had to have foreseen *some* deviation from the example in the DVD. According to Autotech, all its experts needed was a "better view and understanding of the database system in which they were working." (*Autotech's Reply Brief*, at 7). It is impossible to determine whose fault it was, if anyone's, because the current dispute, like others since the case began, involves a clash of pretending and remorselessly conflicting absolutes. *Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.*, 235 F.R.D. 435, 446 (N.D.Ill. 2006). But what is beyond dispute is that Autotech's plan to employ the supposedly simple and infallible search program on the DVD was something new that Autotech introduced at the June 6th hearing as a possible alternative to the expensive retrieval plan ADC said was the only way the information could be retried from its computer system. It did not work. That leaves the original plan. The only question is who is to pay.

A district court has broad discretion to protect a responding party from undue burden or expense in discovery by shifting some or all of the costs of production to the requesting party. Rule 26(c); *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978). Cost-shifting often occurs in cases involving the retrieval of electronically stored data, that is inaccessible except through means that involve undue burden or expense. *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318

7

(S.D.N.Y.2003); *Hagemeyer North America, Inc. v. Gateway Data Sciences Corp.*, 222 F.R.D. 594, 600 (E.D.Wis.2004); *United States v. Amerigroup Illinois, Inc.*, 2005 WL 3111972, *4 (N.D.Ill. Oct. 21, 2005). The difficulties in determining what part of the $80,000 cost is "reasonable" and thus taxable to Autotech are avoidable in this case because Autotech agreed months ago to pay the costs when the estimate was between $40,000 and $60,000. A reasonable allocation in this case is that Autotech should pay 62% of the $80,000 expenditure (which is the middle of the original range of $40,000 to $60,000), but not to exceed $60,000. The remainder will be paid by ADC. This is consistent with ADC's promise "to pay whatever share of [the costs I] determined was unreasonable, whether it was zero . . . it was all reasonable, or some larger amount. . . ." (Hearing Transcript of 6/6/2007, at 12). This is a binding commitment. *Cf. Tamari v. Bache & Co.*, 729 F.2d 469, 472 (7th Cir.1984)(attorney's promise in open court to produce documents); *Doi v. Halekulani Corp.*, 276 F.3d 1131, 1138 (9th Cir. 2002). In addition, ADC must provide proof of actual cost to Autotech and proof of actual payment.

If ADC is able to extract the information for less than $80,000 or if the parties arrive at a different cost-shifting formula, that will control.[2]

Paper is patient, as Justice Frankfurter liked to say. Charges and denials are a key-stroke away, and voluminous exhibits consisting of self-serving emails and letters often confound rather

---

[2] Since Autotech filed its most recent motion to compel and for sanctions, ADC has offered to create a "static clone" of its database system and allow Autotech's consultants to run searches that are narrowly tailored to elicit the information Autotech has requested. This would allow the consultants to search the data as it existed at a single moment in time – a snapshot, as it were – and attempt to produce the proposed report without interfering with ADC's live, operating electronic sales processing system. Autotech has rejected this proposal, arguing that the restrictions that ADC is placing on its use of the data were too limiting to allow any real analysis, and is bristling – understandably, given the June 13th results – at ADC's condition requiring Autotech withdraw its motion to compel regardless of the outcome of this exercise.

than clarify things. Ascertaining what really happened and who is to blame (or in what proportions blame should be allocated) for the current impasse would take even more effort and time than has been expended and would require an evidentiary hearing at which the lawyers would have to testify, and credibility determinations would have to be made. Perhaps realizing the unseemliness of such a proceeding and the potentially embarrassing consequences that would result from those credibility determinations, neither side has asked for a hearing.

ADC and Autotech agreed that the documents would be produced. That agreement is still in place. Both parties agreed that I should exercise my discretion and allocate costs. I have done so. If Autotech still wants the documents, it must notify ADC in writing within five days, and the documents must be produced within twenty-one days thereafter. If Autotech no longer wants the documents, it must so inform ADC in writing within five days. If the required notification does not occur, Autotech's request will be deemed waived.

As the parties conceded months ago, this dispute "has been going on and on and on and on." At some point, all litigation must come to an end. For this issue, the time has come.[3]

---

[3] Public policy has always dictated that at some point "there be an end of litigation...." *Baldwin v. Iowa State Traveling Men's Ass'n*, 283 U.S. 522, 525 (1931). The shortness of life and manifest necessity in part underlie the principle. In 1926, Cardozo lamented that "the fecundity of our case law would make Malthus stand aghast." The Growth Of The Law, 4. In 1926, there were 300 volumes in the first series of the Federal Reporter and 12 in the Second, and both contained the decisions of the district courts as well as the circuit courts of appeals. Today, the Federal Reporter is in its third series and has grown to over 1,700 volumes. The Federal Supplement, which did not even begin until 1932, has grown to more than 1,400 volumes (in two series). The Supreme Court Reports now stand at 550 volumes.

In 1926, volume 12 of the Federal Reporter 2d. was under 1,000 pages even with its combined contents. Volume 485 F.3d is almost 1,400 pages in length, and, of course, does not include district court opinions or the "unpublished opinions" of the courts of appeals, which, according to current statistics, comprise approximately 80% of the courts of appeals' annual production..

Even this does not begin to tell the whole story. The bankruptcy, tax court, and magistrate judges – to say nothing of the outpouring of the state courts – are turning out opinions in record numbers.

## CONCLUSION

For the foregoing reasons, Autotech's motion to compel against ADC and Timothy Hohmann [#334 and #351] is DENIED. That part of the motion seeking sanctions is also DENIED.

DATE: 9/17/07        ENTERED: _____
                              UNITED STATES MAGISTRATE JUDGE

10